[Civ. No. 17950. Third Dist. Jan. 16, 1979.]

JOHN HAMMARLEY, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY,
Respondent;
ALFRED RICHARD SOSA et al., Real Parties in Interest.

390

## COUNSEL

Diepenbrock, Wulff, Plant & Hannegan, William B. Shubb, John V. Diepenbrock and Charity Kenyon for Petitioner.

Van Bourg, Allen, Weinberg & Roger, Victor Van Bourg, William B. Sokol, Roland E. Blubaugh, Daniel I. O'Neill, Wilson & Wong, Geoffrey P. Wong, Gibson, Dunn & Crutcher, Theodore B. Olson, Rosenthal & Leff and Irwin Leff as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Kenneth M. Wells, Public Defender, Kathryn K. Mader, Ernest F. Winters and Michael Anthony Delia, in pro. per., for Real Parties in Interest.

## OPINION

**PUGLIA, P. J.**—Petitioner seeks a writ of review to annul a contempt judgment for refusing an order of respondent court to comply with a subpoena duces tecum. The threshold issue presented by this proceeding is the scope of protection accorded by Evidence Code section 1070 to information acquired by a newsman in the course of his professional activities which has not been disseminated to the public. (Hereinafter all statutory references are to the Evidence Code.) We hold the material sought by the subpoena duces tecum is privileged. We further decide, however, after weighing the competing interests disclosed by the record before us, that the newsman's statutory privilege set forth in section 1070 must here give way to the constitutional rights of the real parties in interest to a fair trial. Since the order of the court requiring obedience to the subpoena duces tecum is valid, we shall affirm the judgment of contempt.

At the time of the events described hereinafter, petitioner John Hammarley was a newspaper reporter for the Sacramento Union. Real parties in interest are defendants in a criminal prosecution charged with the murder of Ellen Delia; the criminal action is currently pending in respondent superior court. For the sake of simplicity, in this opinion we shall refer to real parties in interest as defendants.

In December 1977, there appeared under petitioner's byline in the Sacramento Union three articles about the so-called "Mexican Mafia"

which contained statements made by one Edward Gonzales implicating defendants in the Delia killing. Also in December 1977, New West magazine published an article written by petitioner on the same subject containing much of the same material published in the newspaper articles. Edward Gonzales, with whom petitioner had several telephone conversations and personal interviews before writing these articles, was petitioner's primary source of information for all four articles. Petitioner has in his possession tape recordings, notes and summaries of these interviews.

There were also corroborating sources for the articles whose identity petitioner refuses to reveal. The trial court sustained petitioner's assertion of privilege to avoid disclosure of these secondary sources. That part of the court's ruling is not at issue in this proceeding.

Gonzales is a self-confessed former member of the Mexican Mafia from which he defected and is now an important witness for the People in the murder prosecution against defendants. Because of his circumstances, he has apparently assumed a new identity under official auspices and now resides in another state protected by law enforcement officers against retaliation by his former associates.

On December 16, 1977, at defendants' request, respondent court issued a subpoena duces tecum ordering petitioner to appear as a witness in the criminal action and to bring with him "Any tapes, recordings, transcripts, notes, or any other physical recording of [either telephonic or in-person] interviews" between petitioner and Edward Gonzales. Justification for the subpoena was set forth in the affidavit of counsel for defendant Juan Aguilar Hernandez, who alleged on information and belief "that the above documents are necessary for the impeachment of [Gonzales] the prosecution's primary witness against JUAN HERNANDEZ."[1] Petitioner

---

[1]The affidavit in full recites: "KENNETH M. WELLS, under penalty of perjury, deposes and says: That he is attorney for JUAN AGUILAR HERNANDEZ in the above-entitled action; that said cause has been duly set down for a pre-trial hearing on December 19, 1977, at 10:00 A.M. in the above-entitled court.

"That affiant is informed and believes and upon such information and belief alleges that JOHN HAMMARLEY has in his possession or under his control the following documents:

"Tapes, recordings, transcripts, notes or other physical recording of interviews between JOHN HAMMARLEY and EDWARD GONZALES.

"Affiant believes and so states that the above documents are necessary for the impeachment of the prosecution's primary witness against JUAN HERNANDEZ.

"WHEREFORE, affiant prays that Subpoena Duces Tecum issue.

"I certify under penalty of perjury that the foregoing is true and correct.

moved to quash the subpoena on the ground that it sought production of privileged materials protected from forced disclosure by section 1070.[2] A hearing was held on the motion to quash at which petitioner was the only witness.

On June 26, 1978, respondent court issued a written opinion in which it upheld petitioner's objections to discovery of undisclosed corroborating sources (the primary source—Gonzales—had already been disclosed in the news articles); the court interpreted the "unpublished information" privilege of section 1070 as applying only to unpublished information which might tend to lead to the reporter's confidential source or sources. Alluding to its wide discretion in criminal discovery matters, the court ordered petitioner to produce for the court's *in camera* inspection all his tapes, notes, and transcriptions deriving from his conversations and interviews with Edward Gonzales. The stated purpose of the *in camera* inspection was to determine relevance of, and defendants' need for, the materials and to protect against disclosure of information which might tend to reveal Gonzales' new identity or location.

Petitioner refused to comply with respondent's order; on July 11, 1978, he was cited for contempt and ordered committed to county jail.

"Executed at Sacramento, County of Sacramento, State of California, this 16th day of December, 1977.

"s/KENNETH M. WELLS
"KENNETH M. WELLS"

[2]Section 1070 provides: "(a) A publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"(b) Nor can a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any information procured while so connected or employed for news or news commentary purposes on radio or television, or for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public.

"(c) As used in this section, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated."

Execution of the commitment order was stayed for 30 days to permit petitioner to seek review in this court. On August 4, 1978, we stayed enforcement of the order of contempt and on August 31, 1978, we issued a writ of review, continuing in effect the stay previously issued pending our further order.

## I.

Inasmuch as petitioner does not claim under either the federal or state Constitutions (cf. *CBS, Inc.* v. *Superior Court* (1978) 85 Cal.App.3d 241, 250-253 [149 Cal.Rptr. 421]), we turn immediately to a consideration of the statute. We are concerned here with subdivisions (a) and (c) of section 1070. Insofar as relevant to these proceedings, subdivision (a) provides as follows: "A . . . reporter . . . connected with or employed upon a newspaper, magazine, or other periodical publication . . . cannot be adjudged in comtempt by a judicial . . . body having the power to issue subpoenas, for refusing to disclose, in any proceeding . . . the source of any information procured while so connected or employed for publication in a newspaper, magazine or other periodical publication, *or* for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public." (Italics added.) Subdivision (c) provides, "As used in this section, 'unpublished information' includes information not disseminated to the public by the person from whom disclosure is sought, whether or not related information has been disseminated and includes, but is not limited to, all notes, outtakes, photographs, tapes or other data of whatever sort not itself disseminated to the public through a medium of communication, whether or not published information based upon or related to such material has been disseminated." (See fn. 2, *ante*, pp. 394, for full text of § 1070.)

█ In construing a statute we are mindful of the fundamental rule that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Tripp* v. *Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) We presume that every word, phrase and provision employed in the measure is intended to have meaning and to perform a useful function (*Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 233 [273 P.2d 5]); a construction making some of the words of the enactment surplusage is to be avoided. (*People* v. *Gilbert*

(1969) 1 Cal.3d 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580].) Whenever possible, effect should be given to the statute as a whole, and to every word and clause, so that no part or provision will be rendered useless or meaningless. (*Woodmansee* v. *Lowery* (1959) 167 Cal.App.2d 645, 650 [334 P.2d 991]; *Select Base Materials* v. *Board of Equal., supra,* 51 Cal.2d at p. 645.)

Petitioner urges that section 1070 was intended to protect not only against compelled disclosure of sources or information leading to sources (*Rosato* v. *Superior Court* (1975) 51 Cal.App.3d 190, 217-218 [124 Cal.Rptr. 427]), but also against disclosure of all information acquired by a newsman in the course of his news gathering and processing activities. The social policy underlying the privilege against source-disclosure, petitioner points out, is that of maintaining a free flow of information to the public by enabling a reporter to assure an otherwise reluctant supplier of information that his identity will not be made public if he desires anonymity; without such assurances, it is stated, sources will dry up and the free flow of information will be drastically impeded. (*Rosato* v. *Superior Court, supra,* 51 Cal.App.3d at pp. 212-218.) A reporter's raw notes, petitioner asserts, frequently contain information which has been provided on a "not-for-attribution" basis, by a source who has agreed to let his identity be made public but only in connection with other statements he has made; if the reporter may be compelled to disclose the contents of such raw notes, the same mischief inherent in compelled source disclosure will be present, i.e., the newsman will be unable to guarantee his source that his identity as supplier of information provided on a not-for-attribution basis will remain confidential and sources of information will consequently dry up, all to the detriment of the public's interest in receiving and maintaining a free flow of information.

We think petitioner's more expansive interpretation of section 1070 is correct. The "unpublished information" provisions of section 1070 were added by amendment in 1974. Prior to that time, the statutory privilege expressly encompassed only source disclosure.[3] To hold that despite the

---

[3] Former Evidence Code section 1070 provided: "A publisher, editor, reporter, or other person connected with or employed upon a newspaper, or by a press association or wire service, or any person who has been so connected or employed, cannot be adjudged in contempt by a judicial, legislative, administrative body, or any other body having the power to issue subpoenas, for refusing to disclose, in any proceeding as defined in Section 901, the source of any information procured while so connected or employed for publication in a newspaper.

"Nor can a radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed, be so adjudged in contempt for refusing to disclose the source of any

addition to section 1070 of the "unpublished information" provisions the Legislature still intended to protect only against source disclosure would require us to assume, contrary to one of the fundamental rules of statutory construction, that the Legislature was engaging in redundancy when it added to the statute in 1974. Further, by the use of the disjunctive "or" between that portion of subdivision (a) relating to source disclosure and that portion dealing with disclosure of "any unpublished information," the statute on its face manifests an intent to create two separate classes of information against disclosure of which a privilege may be claimed. Finally, the construction urged by petitioner is consistent with the legislative purpose of maintaining a free flow of information to accomplish which the statute is to be given a broad rather than a narrow construction. (*Rosato* v. *Superior Court, supra,* 51 Cal.App.3d at p. 217.) To the contrary, the interpretation adopted by the trial court narrowly limits the application of the statute in derogation of the underlying social policy it was intended to serve.

Notwithstanding the trial court's reliance on *Rosato* that case does not support the proposition that the privilege encompasses only those unpublished materials which might lead to disclosure of a confidential source. The *Rosato* court was not faced with the question presented here. The issue there was whether newsmen to whom information had been divulged in violation of a judicial order of nondisclosure could be compelled to disclose who among the court's officers subject to the order had provided the information. The *Rosato* court first determined that the information sought by the trial court was within the scope of the privilege against source disclosure, but then held that the privilege must nonetheless yield to the trial court's exercise of its inherent power to control its own proceedings and officers. Accordingly, the newsmen in *Rosato* could be compelled, on pain of contempt, to answer questions directed to the identity of any source from among those persons subject to the trial court's order. The issue in *Rosato* was the scope of acknowledged source protection—not the perimeters of the "unpublished information" privilege.

■ Accordingly, we hold that the statutory privilege protecting unpublished information is not limited to material which might lead to the disclosure of a newsman's confidential sources, but encompasses all information acquired by the newsman in the course of his professional

information procured while so connected or employed for news or news commentary purposes on radio or television." (Stats. 1972, ch. 1431, § 1, p. 3126.)

activities which he has not disseminated to the public. In the case at bench, therefore, the unpublished information contained in the tapes, notes, etc., which respondent court has ordered petitioner to produce for the court's *in camera* inspection is within the scope of the privilege.

## II.

Against petitioner's claim of statutory privilege, defendants interpose their fundamental right to a fair trial, claiming that refusal to enforce the subpoena duces tecum will deprive them of that right as secured by the due process guarantees of the federal and state Constitutions. (U.S. Const., Amends. V, VI, XIV; Cal. Const., art. I, § 15.)

In *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], a witness had confessed to the very crime for which defendant was on trial but defendant had been prevented by state rules of evidence from cross-examining him about his inculpatory statements and from producing other witnesses who had overheard his confessions. Holding that defendant had been denied a fundamental right by operation of the state rules the Supreme Court reversed, observing: "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." (410 U.S. at p. 294 [35 L.Ed.2d at p. 308].)

*Washington* v. *Texas* (1967) 388 U.S. 14 [18 L.Ed.2d 1019, 87 S.Ct. 1920], concerned a Texas statute which prohibited coparticipants charged with or convicted of the same crime from testifying for one another. Defendant was thus deprived of favorable testimony of a witness already convicted of the same crime for which he was on trial. The Supreme Court held that the Fourteenth Amendment due process clause incorporated the Sixth Amendment right of an accused to compulsory process for obtaining witnesses in his behalf and was therefore binding upon the states; because the state statute denied defendant the constitutional right to compulsory process, the conviction was reversed.

In a case dealing with the right of an accused to discover information concerning citizen complaints about past acts of violence by law enforcement officers, our Supreme Court stated: "Allowing an accused the right to discover is based on the fundamental proposition that he is entitled to a fair trial and an intelligent defense in light of all

relevant and reasonably accessible information." (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305].) From that "fundamental proposition" the conclusion follows that "a private nonparty witness is subject to a subpoena duces tecum in a criminal case." (*Pacific Lighting Leasing Co.* v. *Superior Court* (1976) 60 Cal.App.3d 552, 563 [131 Cal.Rptr. 559].)

Relying on the foregoing principles, defendants argue that whatever the scope of the section 1070 privilege, it must yield to their demand for petitioner's tapes, notes, and transcriptions of the Gonzales' interviews because their claim derives from constitutional guarantees while petitioner asserts a right of mere statutory origin. It is true that the highest court in the land has unequivocally held that the First Amendment does not confer on newsmen "a testimonial privilege that other citizens do not enjoy." (*Branzburg* v. *Hayes* (1972) 408 U.S. 665, 690 [33 L.Ed.2d 626, 644, 92 S.Ct. 2646].)[4] Nonetheless the statute under which petitioner claims evinces a strong legislative policy in favor of giving the widest possible effect to the privilege consistent with federal and state constitutional imperatives. Hence, this clash between statutory and constitutional values is not susceptible to mechanical, hierarchic resolution. ■ In weighing the competing interests at stake, we must look beyond the facial due process claim and qualitatively evaluate defendants' assertion that denial of discovery will deprive them of "a fair opportunity to defend against the State's accusations." (*Chambers* v. *Mississippi, supra,* 410 U.S. at p. 294 [35 L.Ed.2d at p. 308].)

■ Faced with a claim of privilege, the burden is on the party seeking to avoid the privilege competently to demonstrate not only that the evidence sought is relevant and necessary to his case, but that it is not available from a source less intrusive upon the privilege. Moreover, as with any attempt to discover evidence subject to a claim of privilege, a defendant must show a reasonable possibility that the evidence sought might result in his exoneration. (*People* v. *Borunda* (1974) 11 Cal.3d 523, 527 [113 Cal.Rptr. 825, 522 P.2d 1].) Plaintiff raised the privilege through

[4]Amicus curiae Society of Professional Journalists urges that we avoid the holding of the United States Supreme Court in *Branzburg* v. *Hayes* (1972) 408 U.S. 665 [33 L.Ed.2d 626, 92 S.Ct. 2646], that the First Amendment does not provide a constitutional privilege to petitioner herein, by finding independent state constitutional grounds for such a privilege in California Constitution, article I, section 2. We decline the invitation, observing, however, that even were the privilege of state constitutional origin, it would not thereby necessarily acquire primacy over other constitutional rights with which it comes into conflict, most particularly those involved here which derive from the United States Constitution.

the device of a motion to quash the subpoena duces tecum. A hearing was held at which defendants elicited testimony from petitioner.

Petitioner acknowledges the existence of and his control over the tapes, notes, transcriptions and summaries of his interviews with Gonzales containing the unpublished information which defendants seek to discover. The published interviews reveal Gonzales to be an eyewitness to and self-confessed participant in the murder with which defendants are charged. Defendants' claim that the published versions reveal inconsistent statements by Gonzales is not disputed by petitioner.[5]

It was revealed at the hearing that Gonzales first approached petitioner offering to submit to interview, and that petitioner agreed to and did pay him for the opportunity. It does not appear that Gonzales sought confidentiality as to any of his statements relevant to the charged offense or that it was promised him by petitioner.[6] For all that the record shows, the decision how much of the interviews to publish was within the exclusive editorial judgment of petitioner and his superiors. Nor has it been shown or even suggested that the content of the unpublished material is significantly different from that which has been placed in the public domain by petitioner. Furthermore, it appears that Gonzales has been given immunity in exchange for his testimony for the prosecution.

▪ Defendants have made substantial showing that petitioner has in his possession undisclosed statements relevant to the charged crime of an important accusatory eyewitness who has made inconsistent statements concerning the event and as to whom there exists evidence from which an inference of bias may be drawn. It does not appear that defendants have access to Gonzales' undisclosed statements other than through the materials in the possession of petitioner.

---

[5]Inconsistencies could exist among Gonzales' published statements and between his published statements and his testimony before the grand jury. We are unable to identify any specific inconsistencies from the record before us because we have been supplied neither the complete text of the published interviews nor the grand jury transcript.

[6]Petitioner met and interviewed Gonzales somewhere outside the State of California. He promised Gonzales he would not reveal that location. Defendants made no attempt to demonstrate entitlement to information concerning Gonzales' present location or new identity and it is difficult to conceive how a compelling need for that information could be shown. The trial court properly recognized the need to preserve confidentiality of this information.

Petitioner's opposition to discovery is absolutist, relying exclusively on the privileged status of the information sought; no effort is made to show that the peculiar facts of this case, when weighed in the balance, preponderate in favor of the privilege and against defendants' claim to discovery in quest of their constitutional right to a fair trial. The proposition that a privilege, even one grounded in the Constitution, is entitled to absolute primacy is called into question by *United States* v. *Nixon* (1974) 418 U.S. 683 [41 L.Ed.2d 1039, 94 S.Ct. 3090]. There the Supreme Court acknowledged the constitutional derivation of the President's claim of executive privilege (418 U.S. at p. 711 [41 L.Ed.2d at p. 1065]), but held that under the circumstances the privilege must yield to the legitimate demands of the criminal justice system for everyman's evidence. The court stated: "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." (*United States* v. *Nixon, supra,* 418 U.S. at p. 709 [41 L.Ed.2d at p. 1064].) However one may characterize the values protected by the newsman's privilege, the dignity and importance of those values furthered by presidential executive privilege compare favorably therewith.

At stake here is defendants' right meaningfully to confront and cross-examine their primary accuser with the benefit of all evidence reasonably available to challenge his credibility. Petitioner's interest is in the vindication of a privilege not to disclose unpublished information which here was freely volunteered with no pledge of confidentiality asked or given and which only fortuitously falls within the literal scope of section 1070 not because of a perceived need for confidentiality but because of the vagaries of editorial judgment.

The state may not abridge a defendant's constitutional right to a fair trial by "denying the accused access to all evidence that can throw

light on issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits." (*People v. Riser* (1956) 47 Cal.2d 566, 586 [305 P.2d 1], quoted with approval in *Hill v. Superior Court* (1974) 10 Cal.3d 812, 816 [112 Cal.Rptr. 257, 518 P.2d 1353].)

██ The judiciary has a solemn obligation to insure that the constitutional right of an accused to a fair trial is realized. If that right would be thwarted by enforcement of a statute, the statute, as in *Chambers v. Mississippi, supra,* 410 U.S. 284, and *Washington v. Texas, supra,* 388 U.S. 14, must yield. This principle is particularly applicable where, as here, enforcement of the statute would not further its objectives. In the factual context of this case, vindication of the statutory policy underlying the unpublished information privilege of section 1070 is an abstraction. For that reason, any prospective burden on news gathering and related activities resulting from subordination of the privilege in this factual context is highly speculative and uncertain. Accordingly, the privilege must yield to defendants' demonstrated need for the subpoenaed materials to insure their right to a fair trial.

While the trial court's interpretation of the scope of section 1070 is erroneous, the order denying the motion to quash and commanding obedience to the subpoena duces tecum was, as we have seen, a proper disposition. The trial court's ruling was made only after defendants, in response to petitioner's claim of privilege, made an affirmative showing of the relevance of, need for and lack of alternate access to the subpoenaed materials. Petitioner also had the opportunity to show that the privilege applied and that it should prevail over defendants' claimed right. The trial court's order is supported by substantial evidence; it is within the jurisdiction of the court and a valid exercise of its power. Thus the trial court's erroneous interpretation of section 1070 offers no excuse for petitioner's refusal to comply with its order. (Cf. *In re Marcario* (1970) 2 Cal.3d 329, 330 [85 Cal.Rptr. 135, 466 P.2d 679]; *In re Berry* (1968) 68 Cal.2d 137, 147-148 [65 Cal.Rptr. 273, 436 P.2d 273].)

██ We emphasize that we are concerned in this proceeding only with the trial court's order denying the motion to quash and directing petitioner to turn over to the court for *in camera* inspection the tapes, notes, etc., of the Gonzales' interviews. Under the circumstances shown here, an *in camera* hearing is not inconsistent with section 915 which prohibits "disclosure of information claimed to be privileged . . . in order

to rule on the claim of privilege. . . ." In the hearing on the motion to quash, defendants met their burden and demonstrated that the privilege must yield to their need for the evidence. As there is substantial evidence to support the denial of the claim of privilege and the claim has been ruled upon by the trial court, there is no statutory impediment to a proceeding *in camera* to inspect the petitioner's materials to protect the interests of petitioner, the witness Gonzales and of all parties.

We deem it appropriate to conclude with these final ruminations. There is nothing in the record to suggest that petitioner arrogates to himself ultimate authority to arbitrate his own claim of privilege and we indulge no such assumption. Indeed, he has confided his dispute to the courts and we assume he will abide and be bound by the result of the judicial process. We would be blind to recent history, however, if we did not recognize that the instant litigation—so reminiscent of recent similar clashes of principle—has the potential to engender in the losing litigant intractable resistance to the judgment of the court. We point out for the benefit of the trial court that in the unlikely event of such resistance the wheels of justice must not be permitted to grind to a standstill. The constitutional right of defendants which we have here recognized is the right to a trial free of state-imposed impediments to its fair conduct. To that end, the newsman's privilege—a creature of state law—must in the instant circumstances be subordinated. Beyond that, the state must make available its process to insure to the extent possible the availability to defendants of needed witnesses and evidence. But as we have suggested, the state has no unfailing mechanism for behavior modification, no infallible nostrum to reduce implacable defiance to compliant obedience anymore than it can guarantee absolutely the presence of essential witnesses to testify when needed. Hence denial of evidence such as this to an accused solely through the intransigence of a contemner would not implicate defendants' constitutional right to a fair trial—a right inviolable through conduct that is strictly private and unofficial. Accordingly, it is clear that a contemner may not by his resistance to legal process prevent the trial of underlying criminal charges in circumstances such as these.

We have hypothesized a state of affairs which we do not anticipate will come to pass. Disobedience has been the exception, not the rule in our system because there is no principle of law in a democratic society which has a greater claim upon our allegiance than adherence to the rule of law. It is, after all, a small price to pay for a civilized society.

In view of petitioner's reliance on privilege and his good faith effort to secure a definitive legal ruling on his claim, the trial court should afford petitioner a reasonable opportunity to purge himself of contempt before executing the order of commitment.

The judgment is affirmed.

Evans, J., and Reynoso, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied May 10, 1979.