STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RUGGER-
IO BOIARDO, DEFENDANT, AND ANTHONY DEVINGO, AN-
DREW GERARDO, JAMES VITO MONTEMARANO, AND AN-
GELO CARMEN SICA, DEFENDANTS-RESPONDENTS.

IN THE MATTER OF THE APPLICATION OF ROBIN
GOLDSTEIN RE: SUBPOENA (ROBIN
GOLDSTEIN, APPELLANT).

Submitted April 25, 1980—Decided May 5, 1980.

*Frederick W. Rose* and *Christine L. Miniman* submitted a brief on behalf of appellant (*Young, Rose & Millspaugh*, attorneys).

*Anthony J. Parrillo*, Deputy Attorney General, submitted a brief on behalf of respondent State of New Jersey (*John J. Degnan*, Attorney General of New Jersey, attorney; *G. Michael Brown*, Assistant Attorney General, of counsel).

*Miles Feinstein* submitted a joint brief on behalf of defendants-respondents (*Miles Feinstein*, attorney for defendant Anthony DeVingo; *John V. Vantuno*, attorney for defendant Andrew Gerardo; *John P. Doran*, attorney for defendant James Vito Montemarano; and *Joseph A. Ferrante, Jr.*, attorney for defendant Angelo Carmen Sica).

*Thomas J. Cafferty* and *A. F. McGimpsey, Jr.* submitted a brief on behalf of *amicus curiae* New Jersey Press Association (*Seiffert, Frisch, McGimpsey & Cafferty*, attorneys).

The opinion of the Court was delivered by

WILENTZ, C. J.

We are asked in this case to review the order of a trial court directing Robin Goldstein, a newspaper reporter, to produce a letter for *in camera* inspection sent to her by Patrick J. Pizuto, a prospective prosecution witness in a criminal trial. Seeking to use the letter to impeach Pizuto's testimony, four defendants at the trial applied for judicial enforcement of a subpoena *duces tecum* served on Goldstein on March 31, 1980. The reporter claimed the protection of the newsperson's privilege, *Evid.R.* 27,[1]

---

[1] *N.J.S.A.* 2A:84A–21 and 21a, supplemented by *L.*1979, *c.* 479 (*N.J.S.A.* 2A:84A–21.1 *et seq.*).

and moved to quash the subpoena on April 3. After a hearing on April 14, the trial court ordered production of the letter for *in camera* inspection under the authority of section 4 of Chapter 479, Laws of 1979, *N.J.S.A.* 2A:84A–21.4, the new shield law. After the Appellate Division denied review, we granted Goldstein's leave to appeal and stayed the trial court's order. We now hold that defendants have failed to satisfy the requirements for that production order under the new law. Specifically they have not demonstrated, by a preponderance of the evidence, the non-availability of less intrusive sources which provide information substantially similar to that contained in the letter. Accordingly, we reverse the determination of the trial court requiring production pursuant to *N.J.S.A.* 2A:84A–21.4 of the letter sent to Ms. Goldstein. Such reversal is without prejudice to further application by defendants to secure the letter, with full opportunity to establish the absence of less intrusive sources.

Although the issue presented by Ms. Goldstein's appeal—whether *a reporter is required to turn over information for in camera* inspection by a trial judge in a criminal case—has been addressed and resolved by this Court in *In re Myron Farber,* 78 *N.J.* 259 (1978) (hereinafter *Farber*), our holding there must be supplemented, since subsequent to *Farber* the Legislature amended the shield law then in effect, *L.*1960, *c.* 52, p. 458, § 21, amended *L.*1977, *c.* 253, §§ 1 and 2 (*N.J.S.A.* 2A:84A–21 and 21a), codifying the two-step structure of the *Farber* procedural guidelines. 78 *N.J.* at 276–77. We conclude that the new shield law embodies those protections of reporters contained in the prior law as it was interpreted in *Farber,* adding only the requirement that a defendant seeking information in a newsperson's possession must prove that, on balance, the value of the particular information to a fair trial outweighs the importance to a free press of shielding that information from disclosure. However, a resolution of that balance in this case is unnecessary at this point, because defendants have failed to show that the information sought is not available through a less intrusive

source as is required by the new law.[2]  A careful review of the facts before us will reveal the deficiencies in the defendants' case, when measured against the procedural burdens established by the new law.

## I.

The defendants[3] who seek production and eventual disclosure of the letter in Ms. Goldstein's possession are presently on trial for loan sharking, bookmaking, extortion, armed robbery, threatening to kill, obtaining money by false pretenses, and conspiracy to commit these and other offenses.  Defendant DeVingo has also been indicted for murder.[4]  These charges are apparently based to a significant extent on evidence obtained through the cooperation of Pizuto, an alleged former confederate of defendants and the author of the letter in Goldstein's possession.  Although the State has not definitely indicated whether it will call Pizuto as a witness, he is clearly a potential source of relevant and material testimony.  The record indicates that he may possess extensive knowledge of the criminal operations of defendants.  He has claimed that for many months he covertly recorded incriminating conversations between himself and defendants.  He has also stated he was an eye witness to the murder allegedly committed by defendant DeVingo.

The particular material sought by defendants is a letter sent by Pizuto to Goldstein, a reporter with the *Daily Register* of Monmouth County, who has been covering the story involving defendants for over two years.  Defendants claim that the letter probably contains material that would aid in the impeachment

---

[2]This result is called for by *Farber* as well.

[3]Anthony DeVingo, Andrew Gerardo, James Vito Montemarano and Angelo Carmen Sica.

[4]The original indictment involved eight defendants, but defendants Boiardo, Lardiere, Ferrari and DePhillips received separate dispositions and are no longer part of the case.

of Pizuto on cross-examination after he has testified on the State's behalf. Specifically, they claim that there is a reasonable probability that the letter describes an alleged "deal" between Pizuto and the State as well as Pizuto's subsequent dissatisfaction with the State for reneging on that deal. This information, defendants argue, is probably inconsistent with testimony Pizuto gave under oath when entering a plea of guilty to an unrelated murder pursuant to a plea bargain in September 1978. In those proceedings, Pizuto stated on the record that in exchange for his cooperation the State had promised that he would receive a sentence of no more than 15 years in prison. He assured the court that no other promise was made.[5] He further asserted that his cooperation and his determination to tell all that he knew had nothing to do with any promise by the State. Instead, he explained that his willingness to help the State was derived from his decision to become a new person, a new man; to live a different life.

Based on information defendants have received from Pizuto himself, they contend that the information contained in the letter will prove to be clearly inconsistent with Pizuto's sworn testimony about his motivations for cooperating with the State, and that such inconsistency will have a profound effect on Pizuto's credibility as a witness for the State. It appears that after Pizuto's plea was entered for the unrelated murder charge, he was secretly "relocated" by federal authorities (under the federal witness protection program) in order to ensure his safety between the entry of his guilty plea and his ultimate cooperation as a prosecution witness.

One month before the trial against defendants was to begin Pizuto reportedly changed his mind, and decided that he would not cooperate with the State. Stories appeared in the media

---

[5]Defendants contend that in the letter, Pizuto claimed the real "deal" was quite different and far more favorable.

attributing statements to Pizuto that the State had "reneged" on its "deal" and that he was going to "tell all." These statements implied that he would reveal some embarrassing information about the way the State had handled his case. The stories provoked speculation about Pizuto's continued willingness to testify and the State's continued interest in using him as a witness. This speculation has yet to be resolved.

Pizuto's decision to terminate cooperation with the State appears to have resulted from the State's suggestion to the sentencing judge in the unrelated murder case that Pizuto receive a fairly substantial sentence of imprisonment. He appears to have viewed the suggestion as a breach of the agreement the State made with him. According to Pizuto he was assured that he would serve little or no time in jail. He claimed this breach was an example of the State's allegedly unfair and improper conduct in this case.

Pizuto's claims were essentially repeated by his attorney at the sentencing proceedings. Pizuto and his wife sent letters to the sentencing judge; they presumably contained information about the same matters. The judge imposed a sentence of 8 to 12 years imprisonment, well within the bargained term of no more than 15 years imprisonment that Pizuto had described in sworn testimony. Pizuto is now incarcerated in the Passaic County Jail, where he has been since March 6, when his bail was revoked on the unrelated murder charge.

Ms. Goldstein's connection with defendants' case, and with Pizuto himself, apparently developed in the course of her coverage of the trial since September 1978. Her coverage enabled her to gain Pizuto's confidence, and she wrote numerous stories in which Pizuto was quoted, sometimes directly. Defendant Montemarano was aware of her interest in the case as well as her ability to get information from Pizuto because of the trust and confidence Pizuto had in her. Montemarano was the only witness called by defendants to testify in the proceedings from which Goldstein appeals, in which he described her coverage of

the case and also recounted numerous telephone conversations he had with Pizuto. During Montemarano's testimony,[6] he revealed that approximately one year before defendants' trial began, while Pizuto was still out on bail, Pizuto advised him on the telephone that "one of these days" he was going to send letters to the press about the conduct of the Attorney General's office toward him as well as information about the deal that he had made with the State. Numerous telephone conversations between Pizuto and Montemarano followed. Shortly after the trial commenced, Pizuto called Montemarano from jail and advised him that "the letters had been sent to the press," which statement carried with it the clear expectation that their substance was to be published by the recipient of the letters. After waiting several days and finding no such publication in the press, Montemarano, who had concluded that the letters were probably sent to Goldstein because of her relationship with Pizuto, asked her if she had received them. Ms. Goldstein said that she had but refused to discuss their contents, and indicated that they would not be published. Such decision not to publish was the subject of continued conversation between defendant Montemarano and Goldstein.

According to Montemarano, Pizuto, in one of the phone conversations between them, described the contents of the letter. It was subsequently represented by Ms. Goldstein's counsel that she had received from Pizuto one letter consisting of two handwritten pages, "designated as being confidential by Mr. Pizuto." Montemarano revealed in that testimony that he had recorded this particular telephone conversation with Pizuto, as well as all other telephone conversations between them. He

---

[6]Because Montemarano's testimony as to Pizuto's conversations with him was offered *only* to establish defendants' due diligence, it was not offered or admitted for the purpose of establishing the truth of that which Pizuto said. It is conceivable that, if Montemarano is examined further, his recreation of Pizuto's extrajudicial statements might be offered for their contents, creating a potential hearsay situation.

intends to produce these recordings for use at some point in the trial. Montemarano also testified that shortly after he learned of the letter and spoke to Ms. Goldstein about its publication, he informed his attorney about it and this information was transmitted to all other defense counsel. At that time, defense counsel, specifically Mr. DeVingo's, subpoenaed Goldstein to produce the letter from Pizuto. As mentioned previously, Goldstein moved to quash the subpoena in exercise of her newsperson's privilege, and the trial court, pursuant to the new shield law, held the hearing required by that statute to determine whether she should be ordered to turn the letter over for *in camera* inspection by the court. These proceedings culminated in an order for production for *in camera* inspection, which order is now before us for review.

## II.

In recent years conflicts between rights of fair trial and free press have frequently emerged on the judicial battleground. The dilemma posed by the clash of these basic constitutional principles manifests itself in a variety of factual settings. Among them are attempts to control prejudicial publicity against defendants through use of closure or "gag" orders imposed on trial participants or the press and attempts to provide live broadcast coverage of criminal pretrial and trial proceedings. The situation now before us presents perhaps the most profound conflict: a request by a criminal defendant for confidential information in the possession of a reporter who is unwilling to reveal the source of the information or the information itself. In *Estes v. Texas*, 381 *U.S.* 532, 85 *S.Ct.* 1628, 14 *L.Ed.*2d 543 (1965), the United States Supreme Court stated that:

The free press has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences, including court proceedings. While maximum freedom must be allowed the press in

carrying on this important function in a democratic society, its exercise must necessarily be subject to the maintenance of absolute fairness in the judicial process. [381 *U.S.* at 539, 85 *S.Ct.* at 1631, 14 *L.Ed.*2d at 699].

However, in *Nebraska Press Association v. Stuart*, 427 *U.S.* 539, 96 *S.Ct.* 2791, 49 *L.Ed.*2d 683 (1976), that same Court expressly rejected the task of assigning priority to either the First Amendment or the Sixth Amendment, determining that neither set of rights was entitled *per se* to precedence. 427 *U.S.* at 561, 96 *S.Ct.* at 2803, 49 *L.Ed.*2d at 699. As a result of this holding, it is necessary in each case where a fair trial and a free press are at odds to balance the particular interests involved, and consider, under the precise facts before the court, whether and in what manner a reconciliation of competing interests may be accomplished that will cause minimum interference with the rights of the parties. *CBS, Inc. v. Superior Court*, 85 *Cal.App.*3d 241, 252–253, 149 *Cal.Rptr.* 421, 427 (Ct.App.1978).

The issue now before us—the compulsion of reporters to divulge confidential information in criminal proceedings—was addressed by the United States Supreme Court in *Branzburg v. Hayes*, 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.*2d 626 (1972), albeit in a grand jury rather than a Sixth Amendment context. In *Branzburg*, the Court held that reporters had no First Amendment privilege of nondisclosure of confidential information when such information was sought by a grand jury properly investigating criminal conduct. Two years later, when faced with a claim of executive privilege, that Court reasserted the primacy of the need for the full production of evidence in criminal proceedings. In *United States v. Nixon*, 418 *U.S.* 683, 94 *S.Ct.* 3090, 41 *L.Ed.*2d 1039 (1974), the Court emphasized that:

We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant

facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense. [418 *U.S.* at 709, 94 *S.Ct.* at 3108, 41 *L.Ed.*2d at 1069].

In *Farber*, this Court was faced with the task of applying the principles of *Branzburg* and *Nixon* to a situation where a newsperson relied upon reportorial privilege to resist a defendant's subpoena for the production of confidential information in a criminal proceeding. Because the Court in *Branzburg* created, at best, a qualified privilege against forced disclosure,[7] a reporter's privilege would necessarily yield unless bottomed on the protection derived from a state constitutional or statutory provision. "It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.[8] 408 *U.S.* at 706, 92 *S.Ct.* at 2669, 33 *L.Ed.*2d at 654.

---

[7]This qualified privilege, under *Branzburg*, would clearly give way to a Sixth Amendment right to compulsory process. The individual right to compel disclosure in order to insure a fair trial is clearly as strong as the state's interest in a full disclosure of all relevant and material information.

[8]The freedom of state courts and legislatures to recognize either an absolute or qualified newsperson's privilege referred to in this passage from *Branzburg* seems to raise questions of constitutional dimension unless limited to situations where that privilege is being exercised so as to limit the conflicting right of the State, *i. e.*, search for the truth in grand jury proceedings. While it is logical to assume that a state may cut back on rights or privileges for itself, it is another matter indeed to suggest that a state can shrink the constitutionally guaranteed rights of an individual, *i. e.*, to fair trial, to compulsory process, to

In *Farber*, we disposed of the possibility that an absolute newsperson's privilege existed under New Jersey law. We there held that the privilege created by *N.J.S.A.* 2A:84A–21, was intended by the Legislature to be as broad as possible. *But see* 78 *N.J.* at 288, Pashman, J., dissenting—Legislature intended the privilege to be absolute; *id.* at 300–301. Handler, J., dissenting—Legislature meant to qualify privilege. Given the circumstances before us in that case, we held the statutory privilege must yield to the accused's right to compulsory process given by the *New Jersey* Constitution, *see* 78 *N.J.* at 274, and stated that the same result would obtain under the Sixth Amendment, *id.* at 272.

While *Farber* does not, in conceptual terms, indicate just how far the Legislature can go in New Jersey in support of a newsperson's privilege in the face of a Sixth Amendment demand for evidence, no claim has been made here that the new shield law cannot constitutionally be given full force and effect.[9] Absent, therefore, any clear impingement on Sixth Amendment rights, the Court's task is simply to determine the legislative intent and to construe the statute accordingly.

---

avoid self-incrimination. Such a reduction of individual constitutional rights effected by a state-created absolute privilege, either statutory or decisional, would seem to suffer from inherent constitutional infirmity.

[9]Defendants suggest that *Farber* provides a yardstick by which a statute creating a newsperson's privilege must be measured; we see no conflict between *Farber* and the balancing provision contained in the new statute. This provision reflects the approach adopted by a majority of the members of the United States Supreme Court where First and Sixth Amendment rights clash. *See, e. g., Nebraska Press Ass'n, supra; see also Gannett Co., Inc. v. DePasquale,* 443 *U.S.* 368, 99 *S.Ct.* 2898, 61 *L.Ed.*2d 608 (1979). Similarly, when faced with fact situations like the one before us, appellate courts in other states have upheld a weighing of interests that places the burden of proof on a defendant to demonstrate relevance, need, etc. *See, e. g., State v. St. Peter,* 132 *Vt.* 266, 315 *A.*2d 254, 256 (Sup.Ct.1974); *Zelenka v. State,* 83 *Wis.*2d 601, 618–619, 266 *N.W.*2d 279, 286–87 (Wis.Sup.Ct.1978); *Hammarley v. Superior Court,* 89 *Cal.App.*3d 388, 153 *Cal.Rptr.* 608 (3d Dist.1979).

The prior history of the legislation indicates an intent to provide newspeople with as broad a privilege against disclosure as can be reconciled with a defendant's Sixth Amendment rights by insuring a careful analysis of the respective interests involved, and a balance between them on the facts of each case.

The language of the new shield law comports with this intent.[10] Essentially it embodies the procedural protections of

---

[10]The statute, L.1979, c. 479, provides in part:

3.  a.  To sustain a claim of the newsperson's privilege under Rule 27 the claimant shall make a prima facie showing that he is engaged in, connected with, or employed by a news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated, and that the subpenaed materials were obtained in the course of pursuing his professional activities.

b.  To overcome a finding by the court that the claimant has made a prima facie showing under a. above, the party seeking enforcement of the subpena shall show by clear and convincing evidence that the privilege has been waived under Rule 37 (C. 2A:84A–29) or by a preponderance of the evidence that there is a reasonable probability that the subpenaed materials are relevant, material and necessary to the defense, that they could not be secured from any less intrusive source, that the value of the material sought as it bears upon the issues of guilt or innocence outweighs the privilege against disclosure, and that the request is not overbroad, oppressive, or unreasonably burdensome which may be overcome by evidence that all or part of the information sought is irrelevant, immaterial, unnecessary to the defense, or that it can be secured from another source. Publication shall constitute a waiver only as to the specific materials published.

c.  The determinations to be made by the court pursuant to this section shall be made only after a hearing in which the party claiming the privilege and the party seeking enforcement of the subpena shall have a full opportunity to present evidence and argument with respect to each of the materials or items sought to be subpenaed.

4.  Upon a finding by the court that there has been a waiver as to any of the materials sought or that any of the materials sought meet the criteria set forth in subsection 3.b., the court shall order the production of such materials, and such materials only, for in camera inspection and

*Farber* complemented by the provision that the value of the material sought as it bears upon the issues of guilt or innocence must outweigh the privilege against disclosure. It can be assumed from this addition that what the Legislature clearly contemplated was a balancing of the interests served by compulsory process in criminal cases against those served by the protection of a newsperson's confidential sources and information, once the strengths of the competing interests had been demonstrated through a showing of relevance, materiality and necessity to the defense, in addition to nonavailability through a less intrusive source. The allocation of the burden of proof in this section, particularly in regard to the ad hoc balancing to be conducted in each situation that presents this conflict, puts the newsperson in the favored position, for it is the *defendant* who has the burden, by a preponderance of the evidence, of proving that that balance of interests is in his favor. In addition, the new law requires that any claim of waiver of the privilege be proved by clear and convincing evidence, an allocation of burden also favoring the newsperson. Finally, the protection afforded a reporter against the disclosure *in camera* to a judge is just as great as that given to disclosure to the parties themselves after judicial review, a further indication that the newsperson's privilege is favored in the statute.

In short, the statute leaves reporters far from helpless. Rather, it imposes a burden on criminal defendants to prove affirmatively a clear need for the material sought; and even where such proof is forthcoming it leaves the court free in each case to

---

determination as to its probable admissibility in the trial. The party claiming the privilege and the party seeking enforcement of the subpena shall be entitled to a hearing in connection with the in camera inspection of such materials by the court, during which hearing each party shall have a full opportunity to be heard. If the court, after its in camera review of the materials, determines that such materials are admissible according to the standards set forth in subsection 3.b., the court shall direct production of such materials, and such materials only.

make an informed judgment concerning the relative weight of the interests involved.[11]

## III.

The reason the new law allows nondisclosure by a reporter when there are less intrusive sources is clear: if substantially similar material can be obtained from other sources, both the confidentiality needed by the press and the interests of the defendants are protected. What is not always clear, however, is that these alternative sources add up to substantially the same material as that in the newsperson's possession since that material is not "known," *i. e.*, when *in camera* inspection is sought, the parties' proof as to what is in the material (which only the newsperson's counsel may have seen) is necessarily circumstantial, based on probabilities. This kind of proof, an accepted everyday occurrence at trials, is apparently unsettling when that which is sought to be proved is a readily available physical object, *e. g.*, a letter, inspection of which would dispose of the question with certainty. Certainty here, however, has a cost: sacrifice of the very interest—confidentiality—sought to be protected by these statutory procedures.

This unwillingness, despite the interests of the press, to accept probabilities when certainty is at hand provokes the dissent. It notes that there is absolutely no way to know what is in the letter other than by reading it. This observation permeates all the other issues raised. The logical progression of this argument would lead to the conclusion that whenever the informa-

---

[11]*See* Branzburg, supra, *Powell, J., concurring:*

The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions. [408 *U.S.* at 710, 92 *S.Ct.* at 2671, 33 *L.Ed.*2d 656].

tion possessed by the reporter is in written form, including her own notes, the writings would invariably have to be produced if relevant, no matter how abundant the less intrusive sources of the same material, since one would *never* be sure that they were precisely the same. This result would attach regardless of the form, tangible or intangible, that the information was in. For example, if Pizuto had conveyed the information to Ms. Goldstein over the telephone, or during a face-to-face discussion, and she had kept that information "in her head," the only "sure" way of ascertaining same would be to put Ms. Goldstein on the stand and recreate that which was recounted to her. Similarly, if during such a telephone or face-to-face conversation, she took notes, the only "sure" way of obtaining the information contained in those notes would be to require their production. Thus, a rule that would require production of Pizuto's letter, irrespective of the availability of substantially similar information, would make the notion of a newsperson's privilege nothing more than an empty promise—the reasoning behind such rule would require the production of everything.

The new law does not require Ms. Goldstein to show that other, less intrusive sources probably contain the same information as that found in the letter; rather the *defendant* has the burden to prove that it is reasonably probable that this information can *not* be secured from any less intrusive source. The defendants here have fallen far short of meeting this burden. That the charges are most serious, while not beside the point, does not relieve them of meeting that burden.[12]  All that defendants have proven with "reasonable probability" is that Pizuto stated in the letter that the State had promised him a bargain substantially better than a maximum term of 15 years

---

[12]Presumably, this factor (*i. e.*, the potential seriousness of a crime), along with a variety of others, was considered by the Legislature in reaching the balance of interests and rights embodied in the new law and uniformly applicable in all criminal proceedings.

imprisonment, and had used unfair tactics in dealing with him. As the trial judge himself observed, there is no evidence indicating that the letter contains any admission by Pizuto that he lied to the State, that, for instance, DeVingo did not commit the murder, or any similar evidence: it would be mere "speculation," observed the trial judge, to assume the existence of such material in the letter. That there *may* be more in the letter is obvious, but once again we emphasize that the language of the statute is clear; it is the *defendants'* burden to show that the evidence is relevant, material and necessary for the defense, and a request for production of the letter is to be judged solely on the basis of what defendants have shown, by a reasonable probability, to be its relevance.

As noted, in order to satisfy the burden imposed by the new shield law, defendants must demonstrate the non-availability of substantially similar evidence through less intrusive sources. Nevertheless, without any such demonstration, the trial court below concluded that no such alternatives existed. A decision of this sort would pass muster under the statute if all suggested alternate sources had been carefully explored and found wanting, or if they were facially unsatisfactory. Neither conclusion can be supported on the record before us.

First, the tapes which Montemarano made of his private conversations with Pizuto may prove to be a less intrusive source of the information contained in the letter. The trial judge concluded that to require Montemarano to produce these tapes in order to establish that they probably do not contain that information would violate Montemarano's privilege against self-incrimination. We disagree. Montemarano sought production of the letter and he voluntarily took the stand and testified to the existence of a possibly less intrusive source. Under these circumstances, we are unable to perceive any Fifth Amendment violation in requiring him to produce relevant tapes for the

purposes of *this* hearing.[13]  When the tapes have been produced the trial court will have to determine to what extent they are a less intrusive source.  This determination would be preceded by a finding that, under all of the circumstances, it appears likely that the tapes contain substantially similar material to that which, in reasonable probability, is contained in the letter.  In addition, the trial judge must determine the extent to which that material can be used before a jury, by excision of portions thereof, without in any way incriminating Montemarano.

■  Another potential source that requires examination consists of the letters sent by Pizuto and his wife to the judge who sentenced him.  Those letters were written at about the same time as the letter to the reporter.  Judging from what Pizuto's attorney said before the sentencing court, they may very well contain substantially similar information.[14]  The defense has failed to prove that these letters do *not* contain that information.[15]

The defense has also failed to prove precisely what Pizuto's attorney said in the sentencing proceedings.  Ms. Goldstein's affidavit states that the attorney told the court that the State

[13]It is clear from the relevant case law that an individual cannot automatically resist production of documents or personal papers simply by asserting a Fifth Amendment privilege, because the applicability of such privilege is for the *court* to decide.  *See In re Addonizio*, 53 *N.J.* 107, 116–17 (1968).  However, it is also important to note that in similar hearings involving Fourth rather than Sixth Amendment rights, a waiver of the privilege against self-incrimination has been held not to extend to the trial itself.  *See, e. g., State v. Petrovich*, 125 *N.J.Super.* 147 (Law Div.1973); *Simmons v. United States*, 390 *U.S.* 377, 88 *S.Ct.* 967, 19 *L.Ed.*2d 1247 (1968).

[14]These letters were incorporated into the presentence report, which has been suggested by the State as a possible less intrusive alternative source.  However, presentence reports (as distinguished from the letters) are not public records and are confidential.  *See State v. De George*, 113 *N.J.Super.* 542 (App.Div.1971).

[15]The letter from Pizuto's wife might suggest other less intrusive sources, including herself.

had reneged on its deal, implying that the promises made to Pizuto were significantly better than the 15 year imprisonment. Although a transcript of the hearing may not provide a complete "less intrusive source," certainly that material could provide the basis for supplying some of the information probably contained in the letter. Reference was made by Pizuto's attorney at that time to tapes and memoranda in Pizuto's possession. He implied that these contained notes or information about the Attorney General's tactics and about the real plea bargain. Defendant has proven nothing about what this less intrusive source may or may not contain.

Montemarano himself is a potential less intrusive source, but he was never examined or cross-examined in detail about conversations he had with Pizuto.

Finally, defendant made no attempt whatsoever to prove that Pizuto himself might not have a copy of the letter, or that Pizuto himself might not testify concerning the contents of the letter or the information contained therein. Whether Pizuto would testify, whether he would testify truthfully, all of these are open questions and problems, but the problem is not the reporter's, it is that of the defendants, for Pizuto is obviously a possible less intrusive source and defendants have made absolutely no effort to prove by a preponderance of the evidence that it is reasonable to believe that he is not such.[16]

## IV.

Our reversal today is without prejudice to any reapplication by defendants for production of this letter. Some of the possible less intrusive sources, especially the Montamarano tapes,

---

[16] If Pizuto agreed to, or in fact sought, the production of the letter in Ms. Goldstein's possession, his waiver of confidentiality must be considered in balancing the importance of the newsperson's privilege against the value of the material sought.

apparently became known to the defendants only at the hearing itself. It would be manifestly unfair to bar them from such reapplication when in fact they have never really had the chance to offer proofs on that particular source. It is important to note in this regard that it was the trial judge who ruled on his own motion that the tapes probably could not be produced, because of the privilege against self-incrimination.

If defendants apply again, they will have the burden with regard to less intrusive sources that has been set forth above. After the trial judge has heard whatever defendants offer concerning all of these sources, even if he is not satisfied that the aggregate of all information derived from these alternative sources necessarily or even probably duplicates all relevant information contained in Pizuto's letter, that perception will not be enough to warrant an order of production. It is the defendants who have the burden to prove that the letter probably contains more relevant information than the less intrusive sources. And it is a burden cast upon them by the Legislature which they must meet before an order can be entered requiring that letter be produced for *in camera* inspection.

We agree with the defendants that they have proven the information contained in the letter is relevant and material. In this regard, we do not believe the Legislature intended to exclude production of materials simply because their only bearing on the case relates to the credibility of a witness. In other situations when credibility is attacked on the basis of bias or interest, courts have spoken of this as something other than a "collateral" issue, but whatever the terminology we feel confident that the Legislature had more in mind than characterizations perhaps suitable for other purposes but not suitable here. Is the material, the information, probably important in the case? If so, the fact that it is directed at a witness's credibility does not exempt it from production. Here, given Pizuto's critical importance to the case, any additional information concerning

his bias, his interest, would satisfy the requirement. That he may have been promised much more than he admitted to might affect his credibility,[17] but more than that it may be relevant to everything that he did during the time when such a promise was in existence.

■ As to whether the information is "necessary to the defense" we do not believe that the Legislature intended this to mean "absolutely essential," or to require the kind of evidence that would make the difference between creating a reasonable doubt and not being able to.[18] Again we think what was intended was that the evidence be of some importance and therefore "necessary." Obviously whether or not it is "necessary" depends, among other things, on whether or not there are less intrusive sources. Were there none we would conclude that the information probably contained in the letter *is* "necessary," meaning it is sufficiently important.

If reapplication for production is made, the trial court should, before determining whether the information is "necessary," first determine what portion (of the information that is probably in the letter) is *not* obtainable through less intrusive sources. It may be that he will conclude this remaining undisclosed information (as distinguished from *all* the information probably in the letter) is not sufficiently important to be characterized as "necessary" even though all of the information in the letter, were there no less intrusive sources, would be.

Finally, we note that on reapplication defendants also bear the burden of showing that the "value of the material sought as it bears upon the issues of guilt or innocence outweighs the privilege against disclosure . . . ." In the particular con-

---

[17]See *State v. Vaccaro*, 142 *N.J.Super.* 167, 177 (App.Div.1976).

[18]See *Zelenka v. State*, 83 *Wis.*2d 601, 619, 266 *N.W.*2d 279, 287 (Wis.Sup. Ct.1978).

text of this case, the balance must include a determination of how "necessary" Pizuto's letter is to defense counsels' cross-examination of him. Clearly, the judge will be best able to accomplish such balance when he has a better idea of whether alternative sources exist, and if so, whether they supply, in the aggregate, enough information to make production of the letter itself unnecessary. The balance must also include consideration of the continued importance to Ms. Goldstein, and to all reporters, of the free flow of information sought to be achieved through the privilege. At that point defendants must show that the letter is more important then the privilege.

We note in this regard that the notion that *in camera* production does not dilute a newsperson's privilege has been rejected by the Legislature. The statute declares as clearly as it possibly could the Legislature's belief that disclosure to a trial judge *in camera* represents precisely the same threat to the interests protected by the privilege as disclosure to counsel or to the world. Precisely the same findings are required by the statute when the procedure is to compel disclosure *in camera* as when it is to compel a turnover by the court to counsel for use at trial. This was not inadvertent. The new shield law bill as originally introduced placed a lesser burden (a prima facie showing) on a defendant for *in camera* disclosure than for production for use at trial (preponderance of the evidence). The most significant change effected by the Assembly's amendment was to increase the burden of proof which a defendant seeking *in camera* disclosure must sustain. The amendment made the burden of proof at *both* stages of the two-step disclosure procedure—*in camera* inspection and production for trial—identical.

Since defendants have failed to meet the burden placed on them by this statute, we must reverse the trial court's order requiring production of the information for *in camera* inspection. The decision is a difficult one, for along with the trial court, we are concerned that we do not know and can not know whether there is material in the letter that might be helpful to

defendants and not otherwise available. Our concern is obvious-
ly heightened by the seriousness of the charges against these
defendants, one of whom is accused of murder. It is under-
standable that under those circumstances the trial court inter-
preted the statute to accord with the exigencies of the case: the
difficulty of negativing the existence of less intrusive sources
given the impossibility of establishing precisely what informa-
tion is in the letter; the likelihood that there is *something*
relevant in the letter; and, presumably, the court's conclusion
that the credibility of Pizuto will be one of the main issues, if
not the main issue, in the case.[19] Our removal from the scene of
trial may make us less able to evaluate the sum of these factors
but, at the same time, perhaps more able to evaluate the
importance which we believe the Legislature attached to the
free flow of information that results when reporters' confiden-
tial sources and information are protected.

*In camera* inspection is usually regarded as less of an intru-
sion upon a privilege of nondisclosure than is production of the
information sought for use in open court proceedings. It is
natural for any judge, knowing that his inspection will forever
remain confidential (unless production for ultimate use at trial is
ordered) to be less concerned about that order than the one
which follows. For that reason, judges are probably more likely,
in the ordinary course of things, to issue orders for *in camera*
production than they are those requiring turnover for use at
trial. Appellate review of orders for *in camera* inspection,
therefore, represents some recognition of the relative ease of
obtaining such orders as well as the belief of most reporters that

[19]The trial judge below asked Ms. Goldstein's counsel what defendants
could have done to better demonstrate relevance, materiality, etc. Although
such an inquiry may be reasonable and even appropriate in a typical dis-
covery proceeding, it does not conform with the allocation of burdens of proof
in the new shield law. There is no burden on the newsperson to prove that
less intrusive sources exist, except insofar as such proof would overcome a
prior showing by defendant as to relevance, materiality and unavailability of
sources.

*any* required disclosure of confidential sources and information has precisely the same chilling effect on the free flow of information as any other. To a confidential source, to all confidential sources, the promise of silence is absolute, and *any* breach is a total one. A Legislature which so highly valued the free flow of information understood that and initially made the privilege absolute for the very reason that *any* disclosure would destroy that flow. To interpret the procedural protections so as to distinguish between the initial disclosure to the judge *in camera* from subsequent disclosures, potentially to the entire world, would be to disregard that judgment by the Legislature.[20]

## V.

In the event of any reapplication by way of further subpoena on Ms. Goldstein to produce the letter, the trial court, assuming the decision on such reapplication is favorable to the defendants, should under no circumstances require its production for *in camera* inspection until Pizuto has commenced his direct testimony. Since all contentions concerning the relevance of the letter suggest that it is to be used only for cross-examination of Pizuto, Pizuto's failure to take the stand, or refusal to testify, will effectively terminate this aspect of the matter—under those circumstances no production of the letter shall be required. We leave it to the discretion of the trial court to determine all other procedural aspects of the matter, particularly the timing of both the hearing and decision on reapplication for production for *in camera* inspection. Since cross-examination of Pizuto may significantly affect the trial judge's evalua-

---

[20]Thus, while *in camera* proceedings have historically served a protective function (disclosure only to the court instead of to the parties and the public at large), in the context of press confidentiality, the Legislature has clearly determined that even this reduced intrusion is of sufficient magnitude to necessitate limiting *in camera* production to situations where no viable alternatives exist for the preservation of individual constitutional (*i. e.*, Sixth Amendment) rights.

tion of whether the letter is still "necessary," he may choose to hold off any such hearing or the decision on *in camera* production, until that cross-examination has been otherwise completed. Cross-examination of Pizuto may itself prove to be a less intrusive source of the information sought; in addition, it may so affect Pizuto's credibility as to persuade the judge that the letter is no longer "necessary." On the other hand the trial court may believe that despite the advantages of delaying the reapplication hearing or the decision on *in camera* production until Pizuto's cross-examination has been completed, the potential harm occasioned by delay at that stage of the trial outweighs the potential advantage of this further information. Under those circumstances the judge might decide to require any reapplication to be made and heard immediately, with decision (and potential appeal) thereon also to occur immediately. The variations on this theme are numerous and are best left to the sound discretion of the trial court.

Since the statute contemplates complete resolution of matters of this kind *before* trial and allows applications after trial only under strictly limited conditions, ordinarily the trial court would expedite every aspect of proceedings of this kind that occur after the trial has commenced. The situation before us, however, is unusual—if not unique—in that not only is the material sought needed solely for cross-examination purposes but there is a possibility that cross-examination without it may render production unnecessary. In addition, this is a trial that is already protracted, one which may very well last another month. The trial judge may consider these circumstances in determining the precise timing of further proceedings.

*In camera* inspection, if ordered, should be by the trial judge only.[21] Although counsel will not be permitted to inspect the

---

[21]See *United States v. Nixon, supra,* 418 *U.S.* at 715, 94 *S.Ct.* at 3111, 41 *L.Ed.*2d at 1068; *see also Palermo v. United States,* 360 *U.S.* 343, 79 *S.Ct.* 1217, 3 *L.Ed.*2d 1287 (1959) (where statute involved carefully restricts disclo-

letter, the statute entitles both parties to be heard on the issue of compliance with the statutory requirements and admissibility of the letter at trial. In addition, if upon inspection, the trial judge becomes aware of additional factors that affect relevancy, materiality, etc., they will, of necessity, bear on his ultimate decision. If he decides that the letter is admissible according to the standards set forth in sections 3b and 4 of the statute, he will direct production of the letter, and the letter only, for use at trial. The order directing such production is immediately appealable under the statute as of right. If the trial judge decides that the information should *not* be disclosed (an order also appealable as of right) the letter will be returned to the newsperson's possession as required by the statute.

For the reasons set forth herein, Ms. Goldstein's motion for leave to appeal is granted and, pursuant to *R.*2:11–2, the trial court's order requiring production of the letter for *in camera* inspection is vacated.

SCHREIBER, J., dissenting.

Application of the Shield Law, *L.*1979, *c.* 479, as interpreted by the Court today, emasculates the defendant's federal constitutional Sixth Amendment rights.[1] The defendant here is denied

---

sure of information, allowing defense to see that which is being inspected during an *in camera* proceeding will defeat the legislative purpose; *id.* at 349–50, 79 *S.Ct.* at 1223, 3 *L.Ed.*2d at 1294).

[1] The majority states that "no claim has been made here that the new shield law cannot constitutionally be given full force and effect." (At 457). Defendant DeVingo's brief filed with this Court has made extensive argument devoted to the Sixth Amendment.

even an *in camera* inspection of evidence by the trial court, unless he meets the impossible burden of excluding all other possible sources of comparable information without knowing with what it is to be compared.

## I

Under the Sixth Amendment and our State Constitution, a defendant has the right "to have compulsory process for obtaining witnesses in his favor." *U.S.Const.*, Amend. VI;[2] *N.J. Const.* (1947), Art. I, par. 10. This right is a fundamental element of due process of law. *Washington v. Texas*, 388 *U.S.* 14, 19, 87 *S.Ct.* 1920, 1923, 18 *L.Ed.*2d 1019, 1023 (1967) (applying the clause to the states).

In *Branzburg v. Hayes*, 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.*2d 626 (1972), the United States Supreme Court held that a newspaper reporter's freedom of the press rights under the First Amendment were not abridged when compelled to testify before a grand jury. Therefore, we held in *In re Farber*, 78 *N.J.* 259 (1978), *cert.* den. 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978), that when a defendant in a criminal proceeding sought information in the possession of a newspaper reporter, the

---

DeVingo's attorney served the subpoena on Goldstein. The other defendants on trial intervened in the proceedings and joined in his request. The only defendant, however, to file a brief before us has been DeVingo.

[2]This amendment has been construed to include the right to production of documents. See, *e. g., United States v. Schneiderman*, 106 *F.Supp.* 731, 735 (S.D.Cal.1952); *Braham v. State*, 571 *P.*2d 631, 644 (Alaska Sup.Ct.1977), *cert.* den. 436 *U.S.* 910, 98 *S.Ct.* 2246, 56 *L.Ed.*2d 410 (1978).

Defendant implicates his compulsory process right as distinct from his right of confrontation under the Sixth Amendment, since he apparently "seeks impeaching evidence by means other than examining prosecution witnesses . . . ." Westen, "The Compulsory Process Clause," 73 *Mich. L.Rev.* 71, 126 (1974). See, *e. g., Braham v. State*, 571 *P.*2d at 645. See generally Westen, "Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases," 91 *Harv.L.Rev.* 567 (1978).

defendant's Sixth Amendment rights were at least as compelling and the data had to be disclosed.

In *Farber*, we also considered the Shield Law then in effect, *Evid. R.* 27, *N.J.S.A.* 2A:84A-21 and -21a, and recognized the legislative intent to protect the confidential sources of and information obtained by the press. Though the Shield Law could not withstand the defendant's Sixth Amendment constitutional challenge, we suggested a procedural mechanism for accomplishing some of the objectives of the Shield Law without impairing Sixth Amendment rights.

We proposed that before the court made an *in camera* inspection, the defendant should show the likelihood that the information sought was material and relevant, that it could not be secured from any less intrusive source and that defendant had a legitimate need to see and otherwise use it. 78 *N.J.* at 276–277. We carefully pointed out that this threshold determination would have to be made "within ever-present constitutional limitations," *Id.* at 276, and cautioned that

[t]he manner in which the obligation of the defendant is to be discharged in the proceedings leading to this threshold determination will depend largely upon the facts of the particular case. [*Id.* at 277]

The Legislature subsequent to *Farber* enacted a new statute attempting in large part to follow the suggested procedural mechanism. *L.*1979, *c.* 479. It provided for the threshold hearing, setting up the following condition precedent to the disclosure of the material to the judge for his *in camera* inspection: a showing that the subpoenaed material was relevant and material and could not be secured from a less intrusive source, that the request was not overbroad, and that the value of the material sought outweighs the privilege against disclosure. *L.*1979, *c.* 479, § 3(b).

From both a policy and constitutional perspective, the Shield Law privilege must be cautiously applied. As observed in

*United States v. Nixon*, 418 *U.S.* 683, 710, 94 *S.Ct.* 3090, 3108, 41 *L.Ed.2d* 1039, 1065 (1974), evidentiary privileges, whatever their origins, are not to be "expansively construed, for they are in derogation of the search for truth." See, *e. g., State v. Briley*, 53 *N.J.* 498, 506 (1969); *In re Richardson*, 31 *N.J.* 391, 396–397 (1960). Furthermore, there exists the strong public policy favoring defendant's discovery in criminal proceedings. See *R.* 3:13–3. Professor Dworkin in his analysis of *Farber* commended the trial court's "sensitivity to the problems of a defendant faced with an investigation whose very secrecy deprives him of the knowledge he needs to show his need to know." Dworkin, "The Rights of Myron Farber," *New York Review of Books*, Oct. 26, 1978, 34, 36.

Legislation must be construed consistent with a defendant's Sixth Amendment rights. In *Davis v. Alaska*, 415 *U.S.* 308, 94 *S.Ct.* 1105, 39 *L.Ed.2d* 347 (1974), the Court viewed a statutory privilege in light of the defendant's Sixth Amendment rights and set the privilege aside. There the testimony of a juvenile offender on probation was crucial to the state's case. Under the state's juvenile offender statute, the defense was precluded from establishing that the witness was on probation. Thus, it was prevented from showing that the witness may have been unduly pressured into offering favorable testimony. The United States Supreme Court reversed the conviction, holding that

> defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' *Brookhart v. Janis*, 384 *U.S.* 1, 3 [16 *L.Ed.2d* 314, 86 *S.Ct.* 1245]." [*Id.* at 318, 94 *S.Ct.* at 1111, 39 *L.Ed.2d* at 355]

The Court concluded that the state's legislated privilege was "outweighed by petitioner's right to probe into the influence of

possible bias in the testimony of a crucial identification witness."
*Id.* at 319, 94 *S.Ct.* at 1112, 39 *L.Ed.2d* at 355.[3]

## II

The majority finds and I agree that the letter in Ms. Robin Goldstein's possession is probably relevant and material to the defense of defendant DeVingo, who is on trial for murder. The letter may materially affect the credibility of its author, Pizuto, a key witness who is asserted to be an eyewitness to the murder allegedly committed by the defendant. Guilt or innocence may turn upon the jury's assessment of the credibility of the alleged-ly only eyewitness to the murder and that credibility may in turn depend upon the contents of the letter. It is obvious that no less intrusive source of what is contained in that letter may be ascertained in the absence of comparing the letter with the alternative material, whatever it may be. At least at this point, the defendant is entitled to the minimum constitutional protec-tion of having the court examine the letter *in camera.*

To require the defendant to exclude all other possible sources of comparable information without knowing with what it is to be compared imposes an impossible burden. Chief Justice Mar-shall long ago alluded to a similar problem in hearing the request of defendant Aaron Burr for a letter held by President Thomas Jefferson. He significantly noted:

> It is objected that the particular passages of the letter which are required are not pointed out. But how can this be done while the letter itself is withheld? Or how can their applicability be shown without requiring the accused prema-

---

[3]See also *Hammarley v. Superior Court,* 89 *Cal.App.*3d 388, 398–404, 153 *Cal.Rptr.* 608, 613–617 (Ct.App.1979) (reporter's statutory privilege out-weighed by "defendants' right meaningfully to confront and cross-examine their primary accuser with the benefit of all evidence reasonably available to challenge his credibility." *Id.* at 401, 153 *Cal.Rptr.* at 615).

turely to disclose his defence? [*United States v. Burr*, 25 *F.Cas.* 187, 191 (C.C.D.Va.1807) (No. 14,694)]

Permitting the trial court to examine the letter *in camera* on this record would not, as the majority suggests, render the less intrusive source provision meaningless. For example, a reporter in the course of his work may have obtained the identity or location of a witness to a crime. Yet a defendant may discover the identity of the witness or his whereabouts through other readily available means. *Cf. In re Kozlov*, 79 *N.J.* 232 (1979). In that case, the defendant, a police chief, after conviction, sought to interrogate a juror on the ground of bias. Another attorney's client had overheard a remark that a juror had boasted that he had gotten even with the defendant for the arrest and prosecution of a member of his family. The information had been submitted to the attorney, Kozlov, in confidence. We rejected an attempt to force disclosure of the name of the attorney's client since defendant's counsel had discovered municipal court records which identified a person presumably related to the juror who had been the subject of a municipal court proceeding in which the defendant's son was the arresting officer. We noted that the affidavit of defendant's counsel and the municipal arrest record were adequate to establish a basis to interrogate the juror, without the need to obtain privileged information. Furthermore, we held that less intrusive means were available to establish bias, namely interrogation of the arrestee and the juror. Accordingly, when applying the less intrusive source provision, a court must consider what is being sought and for what purpose.

The statute as construed by the Court today "imposes a burden on criminal defendants to prove affirmatively" (at 459) the negative of the proposition that there are alternative sources, but denies them the opportunity of comparing such material with what it would replace. Furthermore, defendants must establish a "clear need for the material sought." (at 459). Moreover, even if it were possible to satisfy that burden, the

defendant must show in addition "that the letter is more important than the privilege." (at 457). Once it is established that the defendant has a Sixth Amendment right to the letter, no balancing against a statutory privilege is permissible. These obligations of the Shield Law as construed by the Court today transgress a defendant's Sixth Amendment rights.

At this juncture in the proceedings, the legislative intent and purpose of the Shield Law, consonant with the defendant's Sixth Amendment rights, will best be served by delivery of the letter to the trial court to be kept under seal until Pizuto's examination has been completed. If Pizuto is not called to testify, then the need for the letter would appear to be at an end. If he does testify, then the relevance and materiality of the letter and its comparability with material from other sources can be determined by the trial court's *in camera* inspection. As we remarked in *Farber*, "[t]hat inspection is no more than a procedural tool, a device to be used to ascertain the relevancy and materiality of that material." 78 *N.J.* at 275. If need be, the hearing with the parties may then be held. *L.*1979, *c.* 479, § 4. In this fashion both the defendant's Sixth Amendment constitutional rights and the newspersons's privilege as memorialized in the statute may be preserved.

I would affirm the order of the trial court as modified herein.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, HANDLER and POLLOCK—6.

*For modification and affirmance*—Justice SCHREIBER—1.