STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RUGGER-
IO BOIARDO, DEFENDANT, v. ANTHONY DEVINGO, AN-
DREW GERARDO, JAMES VITO MONTEMARANO AND ANGE-
LO CARMEN SICA, DEFENDANTS-RESPONDENTS.

IN THE MATTER OF THE APPLICATION OF ROBIN
GOLDSTEIN RE: SUBPOENA. (ROBIN
GOLDSTEIN, APPELLANT).

Submitted May 21, 1980—Decided May 21, 1980.

*Frederick W. Rose* submitted a brief on behalf of appellant (*Young, Rose & Millspaugh,* attorneys).

*John DeCicco* and *Bruce M. Merrill,* Deputy Attorneys General, submitted a brief on behalf of respondent State of New Jersey (*John J. Degnan,* Attorney General of New Jersey, attorney; *John DeCicco* and *Bruce M. Merrill,* Deputy Attorneys General, and *G. Michael Brown,* Assistant Attorney General, of counsel).

*Miles Feinstein* submitted a joint brief on behalf of respondents (*Miles Feinstein,* attorney for defendant Anthony DeVingo; *John V. Vantuno,* attorney for defendant Andrew Gerardo; *John P. Doran,* attorney for defendant James Vito Montemarano; and *Joseph A. Ferrante,* attorney for defendant Angelo Carmen Sica).

The opinion of the Court was delivered by

WILENTZ, C. J.

We are called upon for the second time in this ongoing criminal case to review the trial court's order that a reporter turn over certain letters to the court for *in camera* inspection. On our first review, we reversed an earlier, similar order, holding that defendants had not made a sufficient showing under the new shield law (*N.J.S.A.* 2A:84A–21.1 *et seq.*) to warrant compelled production. *State v. Boiardo,* 82 *N.J.* 446 (1980). Our reversal, however, was without prejudice to defendants and permitted reapplication for such inspection upon presentation of further proofs. Such reapplication was made by defendants, and after hearing the additional evidence, the trial

court again ordered the reporter to produce the letters for *in camera* inspection.

The Appellate Division granted Ms. Goldstein's (the reporter's) motion for leave to appeal. While the matter was still pending there, we directly certified the appeal on our own motion. (*R*.2:12–1). We reverse the trial court and further hold that in the absence of newly discovered evidence regarding the contents of the subpoenaed letters or other changed circumstances, defendants may not reapply to the trial court for their production. *See infra* at 358–359.

In our first opinion in this case, we gave effect to the legislative judgment clearly expressed in the new shield law: the need of the press for protection not only from the production of confidential material at trial but also for protection against even that limited disclosure that occurs when the court itself examines the material *in camera.* The same interest we found controlling in our earlier opinion—the protection of confidential matters from *any* disclosure whatsoever—is again involved. Under the circumstances before us it requires precisely the same protection.

I.

We begin by reviewing defendants' contention that the compulsory process clause of the Sixth Amendment of the Federal Constitution requires production of the letters. Neither the present appeal nor defendants' first application presents a conflict between the new shield law and a criminal defendant's Sixth Amendment right to compulsory process since neither involves an impairment of that right. The right to compulsory process has never been held to require production of an item of evidence upon a defendant's mere unsubstantiated assertion that it would assist in his defense regardless of its availability through other sources. We do not question the relevance of the information contained in the letters. However, as we view the record in this case, the availability of numerous less intrusive sources of the information has been established to a reasonable certainty. It is reasonably certain that all that is contained in

the letters that has anything whatsoever to do with this trial is Patrick Pizuto's (the author's) written assertion that the State had promised him a non-custodial sentence in exchange for his cooperation [1] and had reneged on that promise. Proof that Pizuto said precisely this on numerous other occasions is available, and includes both oral and written statements by him. Thus, we again find it unnecessary, as we did when the case first came before us, to evaluate and balance the interest of the press in non-disclosure against the right of defendants to compulsory process. This is a balancing ultimately required under the new shield law only in those cases where that which is sought by compulsory process promises, at least with some degree of probability, to contain information not otherwise available that may be of help to a defendant. That is not the case here.

When this matter first came before us, the difficulty it presented stemmed from the incomplete state of the record. While there was evidence concerning the contents of the letters themselves, there was very little about what information was contained in the potentially less intrusive sources. Under those circumstances, it was clear that the order of production for *in camera* inspection was premature and had to be reversed, since the inquiry into the existence and contents of less intrusive sources had been minimal at best and the record suggested that such sources might be numerous.

We find reversal on the record *now* before us more clearly required than before. We are now reasonably certain as to the contents of the letters. Furthermore, the trial court has conscientiously examined the less intrusive sources and we now can say, again with reasonable certainty, that those sources will provide the same information, in many different forms (some more persuasive than the letters) as is contained in the letters.

---

[1] *I. e.*, by obtaining evidence in the future against these defendants as well as by testifying truthfully concerning all matters involved in the case, including his eye witness account of the murder alleged to have been committed by defendant Anthony DeVingo.

It is clear that defendants have failed to meet the burden of proof imposed on them by the new shield law.

## II.

Pizuto's importance in this case is clear. An alleged former confederate of defendants, Pizuto agreed, as part of a plea bargain on an unrelated murder charge, to continue his participation in the alleged conspiracy while being "wired" so as to record the goings-on among the alleged participants in the conspiracy. His cooperation allegedly began in February 1978, and continued for more than six months, until his decision to turn informant was announced in the Passaic County courtroom where he entered his guilty plea to the unrelated murder. A number of events transpired thereafter (see *Boiardo* I, 82 *N.J.* at 450–452) creating doubt as to whether Pizuto would in fact be called to testify by the State, and would in fact testify if called. At the time of our original decision in this case, it appeared that Pizuto would be called to the stand, but there was speculation that he would assert his Fifth Amendment privilege and refuse to testify as the State's lead witness. However, since our opinion was filed, the State called Pizuto and, on direct examination, he testified without asserting the privilege.

It has been and continues to be defendants' contention that the letters sent from Pizuto to Ms. Goldstein contain information that is crucial to the defense's attack on Pizuto's credibility on cross-examination. In addition to other available sources, we now have Pizuto's testimony, taken in the hearing on this matter, as to the contents of the letters. Pizuto said that he sent Ms. Goldstein two letters. The first was addressed to her and in large part thanked her for her "honest" reporting. It also contained instructions for possible publication of the other letter attached. This second letter, although sent to Ms. Goldstein, was addressed to Major Dintino of the New Jersey State Police. Pizuto testified that this letter dealt with his dissatisfaction with State officials because of their failure to keep a promise that he would not serve any time in prison which was allegedly made to him before he was sentenced on the unrelated

murder charge. It berated Major Dintino for the unfair "deal" given to Pizuto by State officials after he had cooperated with them for a long period of time. The contents of the letters were partially confirmed by taped conversations between Pizuto and defendant James Vito Montemarano (referred to in *Boiardo* I). The tapes were produced during the trial court's hearing and have been made available to this Court.

Defendants' proposed use of the letters is the same as before: for cross-examination purposes as a prior inconsistent statement and as evidence of Pizuto's "bias," *i. e.* his motive—a non-custodial sentence—for helping the State's case, perhaps by lying for it.

### III.

In our first opinion in this case, we indicated that defendants had fallen far short of demonstrating the non-availability of less intrusive sources by a preponderance of the evidence, and listed a variety of alternative means for gaining information about the alleged deal promised to Pizuto by the State. The trial judge, in the hearing held on reapplication for production of the letters, held that defendants had successfully shown that the alternative sources we described did not contain a description of what was in the letters. However, this was not the showing required under the statute. Rather, it was defendants' burden to prove that the alternative sources did not contain information substantially similar to the information contained in the letters—that the State had promised Pizuto a non-custodial sentence, a deal far better than the one he received at sentencing. Therefore, the trial judge's conclusion as to the non-availability of less intrusive sources was necessarily in error, as was his decision based thereupon.

Our review of the possible less intrusive sources reveals a plethora of information substantially similar to that contained in the letters. The Montemarano tapes, which were made available to the State and the defense, contain numerous statements by Pizuto concerning the "raw deal" he received when he was

sentenced to time in prison instead of non-custodial time. It would be inappropriate to detail any of these conversations between Montemarano and Pizuto in the context of this opinion, but they contain statements by Pizuto concerning promises the State made to him, concerning the State's conduct throughout the investigation and Pizuto's cooperation therewith.

The letters sent to the sentencing judge by Pizuto and his wife similarly contain information about the meeting held between Pizuto and representatives of the State. According to these letters Pizuto was supposedly promised that he would not serve any time in jail. Although the letters, as a part of the presentence report, would normally be confidential and not a part of the public record, Pizuto had consented to their publication and use as a less intrusive source. The description of the meeting contained in the letters, including the State's assurance of a non-custodial sentence and of Pizuto's disappointment at receiving a custodial sentence, have precisely the same potential value as the letters to Ms. Goldstein do for impeaching Pizuto's credibility as a witness. In fact, Pizuto testified that the Goldstein letter (the one addressed to Major Dintino), which consisted of one handwritten page was "much, much shallower," than his letter to the judge.

In his testimony during the hearing on the reapplication for production, Pizuto acknowledged that the sentencing proceedings on the unrelated murder charge contained a presentation by his attorney that was far broader than anything contained in the letters to Ms. Goldstein. A review of the transcript of those sentencing proceedings reveals numerous factual allegations by Pizuto's attorney of an agreement for a non-custodial sentence and Pizuto's disappointment with the State. Defendants argued that the proceedings, and the statements made by Pizuto's attorney, were not a less intrusive source because Pizuto himself did not make the presentation, and because in his testimony in the hearing below, Pizuto said he was not necessarily in agreement with some of the things that his attorney said at the hearing. This argument, which was accepted by the trial court below, must fail. Although there is no question that it was

Pizuto's attorney and not Pizuto who provided the information contained in the sentencing transcripts, it is obvious that he spoke for, and with the authority of, his client, who was sitting next to him. Moreover, Pizuto had a right of allocution before sentence was pronounced, at which time he could have repudiated the statements his attorney had made. Instead, when asked by the sentencing judge whether he had anything to add to his attorney's presentation or had anything else that he wished to say, he responded in the negative. Certainly, Pizuto is not bound by his attorney's statements, and is free to deny their accuracy. However, there is no reason that the information provided through his attorney's statements, with his permission, cannot be presented to the jury, which may give them the same effect as it would to Pizuto's own statements.

The testimony of Pizuto at the hearing below also provided defendants with an obvious alternative source of information about the various agreements allegedly made between him and the State. Pizuto testified directly in these very proceedings that he had been promised a non-custodial sentence.

Finally, at some time in March 1978, *actual conversations* between Pizuto and State representatives were taped which are strongly suggestive of a promise of a non-custodial sentence. While the record below does not clearly set forth the circumstances of their introduction into evidence, a portion of a transcript of the tape was read into the record by consent. It is difficult to imagine a more persuasive less intrusive source of Pizuto's statement that such a promise was made than a recorded version of the actual agreement.

This review leads us to conclude that the defendants have failed to meet their burden of proof under the new shield law: that the information sought could not be gained elsewhere. In fact, although there was no burden on Ms. Goldstein to demonstrate that the information was available through less intrusive alternative sources, we believe that the information provided in the record shows their availability to a reasonable certainty. Therefore, we find it unnecessary to remand the case again for further consideration of these factors, and hold that, absent the

discovery of new evidence concerning the contents of the letters or other changed circumstances, Ms. Goldstein need not produce the letters for either *in camera* inspection or production for use at trial.

## IV.

■ The difference between the majority and the dissent as we view it, is essentially the same as in *Boiardo* I: the dissent disputes the proposition that circumstantial evidence proving the contents of a document (the letters) could ever be a legally satisfactory substitute for *in camera* inspection sought by a defendant in a criminal case. The doubts expressed by the dissent as to the adequacy of such circumstantial proof are based on questions concerning Pizuto's recollection and truthfulness. They lead the dissent to conclude that less intrusive sources have not been shown to be "identical" to the letters. However, there was no challenge whatsoever to Pizuto's credibility on this issue. As a matter of fact the trial judge noted: "I am satisfied that the source himself [Pizuto] has made every effort to disclose to us what is in the letter." Our review of the record satisfies us that while he refused to claim certainty, the accuracy of Pizuto's recollection was clearly established. Through his testimony, the testimony of others and the surrounding circumstances, the content of the letters and the virtual identity to those contents of the information provided by the less intrusive sources have been established to a reasonable certainty. We do not believe the Sixth Amendment requires more.

■ The dissent suggests that the right of compulsory process is virtually absolute. In addition, it apparently rejects the right of courts to control, within certain constitutional and jurisprudential boundaries, the production and introduction of evidence in a criminal trial once a defendant has made a request therefor. We see no occasion for comment on the former proposition because it is clear to us that the Sixth Amendment right of compulsory process, as well as its analog in our State Constitution, is bottomed on a showing of "legitimate need," *Farber,* 78

*N.J.* 259 at 274, quoted by the dissent at 363. It is only where such need has been demonstrated that the "rigorous" constitutional standards of the confrontation and compulsory process clauses attach. While the showing required to establish that need has not been previously defined (there being a lack of decisional law on the subject—*see, e. g.,* Westen, "Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases," 91 *Harv.L.Rev.* 567, 586–87 (1978)—it seems clear that the Constitution would not require production of evidence where a lack of need has been demonstrated to a reasonable certainty because precisely the same "necessary" information is readily available through a variety of other, less intrusive sources.

The effect of the dissent would be to deny to the courts the power, through rules of evidence, discovery, etc., to limit the flow of information in a criminal trial, and to require instead *in camera* production of subpoenaed information in virtually all situations. *See Boiardo* I, 82 *N.J.* at 460. The resulting inflexibility is wholly contrary to our present system of justice, and would serve to tie the hands of trial judges who otherwise would be free to exercise discretion in the admission of evidence, within the strictures of the Bill of Rights. We are unwilling to take such a step backward and to "close and lock the door" thereby.

Finally, the dissent does not accept our understanding of the purposes of the new shield law. It suggests that where the information in a confidential document is "known," the purposes of the privilege are not disserved by compelling the reporter to produce it. However, *every* compelled production chills confidential sources. One of the purposes of the new shield law is to minimize that adverse effect by confining compelled production to cases where it is *necessary*. It is precisely where the information *is* otherwise known that the production of confidential documents should *not* be compelled, for the obvious reason that it is *not* necessary.

## V.

■ Defendants claim that the privilege of non-disclosure was waived by Pizuto's request that Ms. Goldstein read the letters to him before he testified about their contents. The testimony makes it clear that, to the extent the privilege depends on Pizuto's continued desire to keep the letters confidential, there was no waiver. Pizuto expressly claimed that he did not want the letters themselves published. More to the point, however, the privilege is that of the newsperson and not the source.

The order of the trial court for production of the subpoenaed documents for *in camera* inspection is hereby reversed.

SCHREIBER, J., dissenting.

The door has now been closed and locked. Relevant and material evidence which no court has seen has been suppressed although that evidence could have had a crucial role in assisting the jury's evaluation of the credibility of a key prosecution witness. The result has been reached by rejecting the Sixth Amendment implications and the trial court's factual assessment. The Sixth Amendment issue is whether a defendant has a constitutional right to compulsory process to produce a letter, containing relevant and material evidence, for a court's *in camera* inspection to determine if the same material is available through other sources. If such a right exists, then does the newsreporter shield law, *N.J.S.A.* 2A:84A–21.1 *et seq.*, which places the burden on the defendant to prove what is in the letter (without his having had the opportunity to read it) and also to establish that the contents are not available through other sources, conflict with defendant's Sixth Amendment right?[1]

---

[1] It is important to recognize that the question whether the letter is privileged "is ultimately a federal one to be resolved by constitutional standards, [and] that the constitutional standard is a rigorous one. . . . " Westen, "Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases," 91 *Harv.L.Rev.* 567, 593 (1978). In my dissent in *State v. Boiardo*, 82 *N.J.* 446 (1980), I advocated an interpretation of the shield law which would comport with the Sixth Amendment. The majority has seen fit

As to the second matter, the trial court's factual assessment, the trial court's feel of the case and factual findings of necessity for production of the letter should be respected. See *State v. Johnson*, 42 *N.J.* 146, 161 (1964).

Pizuto's letter may be important and crucial evidence for the jury to consider in determining his credibility. Yet, its contents are not known and will remain unknown. I cannot conclude on this record that the less intrusive sources provide "precisely the *same*" information that is in the letter.[2] 83 *N.J.* at 360 (emphasis added). The majority's conclusion assumes (1) that Pizuto had a complete recollection, which he denied, of what he had written in the letter; (2) that the letter was identical with, not simply similar to, the less intrusive material; and (3) that Pizuto's declarations before the trial court concerning the contents of the letter were accurate. The trial court did not accept any of these assumptions.

The trial court, after carefully considering and weighing all the evidence, found the less intrusive sources were not satisfactory for several reasons. The trial court pointed out that Pizuto was not certain as to what he wrote in the letter. Before testifying, Pizuto sought unsuccessfully to have the newsreporter read the letter to him so that his testimony would be accurate. The trial court noted that the Pizuto letter may have referred to his grand jury testimony. Apparently, none of the less intrusive sources dealt with this subject. The trial court found also

> that what Mr. Pizuto had to say about Major Dintino in that letter written to Robin Goldstein is relevant information with respect to information that could be used to possibly impeach Mr. Pizuto and it is not in anyway fully covered or

---

to construe the shield law literally. This interpretation sanctions the *Legislature's* control over what may or may not be offered into evidence.

[2]Defendant's proposed use of the letter was to attack Pizuto's credibility, but he did not limit or concede that its contents were to be used solely to show Pizuto's bias to help the State's case in return for a non-custodial sentence. Even if the letter were limited to Pizuto's "deal," the details in the letter could be significantly different from those in the other sources and could have had a much greater impact at trial.

even adequately covered by the information obtained from less intrusive sources with respect to what Major Dintino had said. And the same would go with respect to whatever Deputy Attorney General Bozza had said. There is very little said in most of those less intrusive sources about Mr. Bozza, and that may be crucial.

The trial court concluded that the "alternative sources [do] not duplicate all of the potentially relevant information contained in the Pizuto letter." In its opinion the letter may bear "significantly" on "the issue of guilt or innocence" and "therefore it is necessary to the Defendants."

The defendant's Sixth Amendment rights, including his right to a fundamentally fair trial by obtaining evidence which may be helpful to his defense, are entitled to be safeguarded by at least permitting the trial court to make an *in camera* inspection of the letter. Those rights include the production of evidence which may or may not be ultimately found admissible at trial. In *In re Farber*, 78 *N.J.* 259 (1978), *cert.* den. 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978), we interpreted Article I, § 10 of the New Jersey Constitution which is worded exactly the same as the Sixth Amendment,

as affording a defendant in a criminal prosecution the right to compel the attendance of witnesses and the production of documents and other material for which he may have, or *may believe he has,* a legitimate need in preparing or undertaking his defense. It also means that witnesses properly summoned will be required to testify and that material demanded by a properly phrased *subpoena duces tecum* will be forthcoming and available for *appropriate examination* and use. [78 *N.J.* at 274; emphasis added]

The decision to produce Pizuto's letter, whose contents cannot be known without examination, prior to its introduction into evidence, should be placed "in public, not [the] private, hands" of the reporter. *Branzburg v. Hayes*, 408 *U.S.* 665, 698, 92 *S.Ct.* 2646, 2665, 33 *L.Ed.*2d 626, 649 (1972). See also *United States v. Nixon*, 418 *U.S.* 683, 711, 94 *S.Ct.* 3090, 3109, 41 *L.Ed.*2d 1039, 1066 (1974) (It is the duty of the courts to vindicate the guarantee of the Sixth Amendment). The need for *in camera* review is not to be equated with the need for introduction of the letter into evidence. Only after the trial court has examined the letter can it determine whether there are any less intrusive

sources.[3] *Cf. United States v. Garrett*, 542 *F.2d* 23, 26 (6 Cir. 1976) (Sixth Amendment confrontation right abridged where trial court erroneously denied *in camera* review of confidential record). See generally, *Kerr v. United States Dist. Ct.*, 426 *U.S.* 394, 405–406, 96 *S.Ct.* 2119, 2125, 48 *L.Ed.2d* 725, 734–735 (1976); *United States v. Nixon*, 418 *U.S.* 683, 714, 94 *S.Ct.* 3090, 3110, 41 *L.Ed.2d* 1039, 1067 (1974); Note, "Defendant v. Witness: Measuring Confrontation and Compulsory Process Rights Against Statutory Communications Privileges," 30 *Stan.L.Rev.* 935, 986 (1978). Furthermore, placing the burden on defendant to prove precisely what was in the letter and that the alternative sources did not contain the same information as in the letter compounds the adverse impact on defendant's constitutional right of production.[4]

---

[3]When several sources of comparable material are available, it may be contended that the defendant has the right to make the choice of what he shall use. In *United States v. Seeger*, 180 *F.Supp.* 467 (S.D.N.Y.1960), the defendant was charged with willful refusal to answer a question during an investigation of the House Committee on Un-American Activities. The Government sought to quash a subpoena served upon the Chairman of the Committee and urged that all the matters which the witness could be called upon to testify to were deducible from documents, records and minutes of the Committee's proceedings. Judge Weinfeld refused to quash the subpoena. He wrote:

Under the Sixth Amendment to the Constitution a defendant accused of crime is guaranteed the right to compel the attendance of witnesses. Who these witnesses shall be is a matter for the defendant and his counsel to decide. It does not rest with the prosecution or the person under subpoena. The defendant may not be deprived of the right to summon to his aid witnesses who it is believed may offer proof to negate the Government's evidence or to support the defense. The fact that the witness here under subpoena is a member of Congress does not submerge the basic question—the right of the defendant in a criminal prosecution to compulsory process. [*Id.* at 468; footnote omitted]

[4]The majority overstates the position I am advocating when it states that under my view circumstantial evidence proving the contents of a document could never be a legally satisfactory substitute for *in camera* inspection. 83 *N.J.* at 359. *Cf. In re Kozlov*, 79 *N.J.* 232 (1979); see discussion in dissenting opinion in *State v. Boiardo*, 82 *N.J.* at 451–452.

In *Farber* we held that when a defendant's Sixth Amendment right and a statutory privilege conflicted, the privilege must yield. Here the Legislature is preventing the court from deciding whether that conflict exists. It is because of the shield law that the court may not examine a relevant and material document and decide whether the defendant is entitled to have that document placed in evidence. This proposition is contrary to the policy long advocated in this State of presenting all relevant and material facts to a jury to assist it in its search for truth. Chief Justice Vanderbilt wrote in *In re Selser*, 15 *N.J.* 393, 405 (1954), "the doctrine of privileged communication runs counter to the fundamental theory of our judicial system that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice."

I suggest that under the circumstances of this case the trial court has a right to examine the letter and subsequently exercise an informed judgment as to whether the letter is admissible, not only with respect to less intrusive source data, but also with respect to cumulativeness, redundancy and remoteness. In this manner a trial court may exercise its discretion, rather than being prevented from doing so.

The setting in which the request for the letter is made should not be overlooked. Preserving the confidentiality of the newsreporter's sources and her work product is not at stake. The majority asserts that the information in the letter is known. If that is so, then none of the major purposes which motivated adoption of the shield statute is present in this case. It is difficult to believe that sources seeking anonymity will be discouraged from confiding in the press because of an *in camera* inspection of the letter in this case, where the source has publicly acknowledged that he wrote the letter and has made every effort to divulge its contents. The effort to avoid this speculative chill should not be permitted to deny the defendant's constitutional right by impeding the judicial role of determining whether that right is being adversely affected.

As indicated in my previous dissent, I am of the opinion that defendant's Sixth Amendment right to have compulsory process

may not be infringed at this preliminary stage because of a statutory evidentiary privilege.

I would affirm the trial court's order.

*For reversal*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, HANDLER and POLLOCK—6.

*For modification and affirmance*—Justice SCHREIBER—1.