IN RE SUBPOENA ISSUED TO EVAN SCHUMAN, APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. GARY J. MAYRON, DEFENDANT.

Argued October 11, 1988—Decided January 23, 1989.

*Arnold H. Chait* argued the cause for appellant (*Vogel, Chait, Schwartz & Collins,* attorneys; *Arnold H. Chait* and *Aron M. Schwartz,* on the brief).

*Jared L. McDavit,* Assistant Prosecutor, argued the cause for respondent (*Richard E. Honig,* Sussex County Prosecutor, attorney).

*Thomas J. Cafferty* argued the cause for *amicus curiae* New Jersey Press Association (*McGimpsey & Cafferty,* attorneys; *Thomas J. Cafferty* and *A.F. McGimpsey, Jr.,* on the brief).

*Edward F. Lamb* and *Jack M. Sabatino* submitted a brief on behalf of *amicus curiae* Newark Morning Ledger Co. (*Robinson, Wayne, Riccio & La Sala,* attorneys).

*Peter J. Laemers* submitted a brief on behalf of *amicus curiae* New Jersey Herald (*Morris, Downing & Sherred,* attorneys; *Peter J. Laemers* and *Pamela A. Reeve,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal raises the question of whether a newsperson can be compelled by the State to testify at trial concerning a confession made to him in the pursuit of his professional activities by a criminal defendant after the confession has been published in the newspaper. We find that under the provisions of the New Jersey Shield Act, *N.J.S.A.* 2A:84A–21 the reporter cannot be compelled to testify.

This matter arises out of the capital case of *State of New Jersey v. Gary J. Mayron* (Sussex County Indictment No. 86–05–0096–I), in which defendant Mayron is charged with kidnapping (*N.J.S.A.* 2C:13–1b) and murder (*N.J.S.A.* 2C:11–3) of seventeen year-old Susan Brennan. At trial,[1] the State sought the testimony of a reporter, Evan Schuman, whose accounts of telephone conversations with defendant were published in the *New Jersey Herald* on April 8 and 10, 1986,[2] five weeks prior to defendant's indictment.

Schuman's front page articles detailed the substance of their conversations. His April 8, 1986, story, under the headline, "Murder Suspect: 'I just lost it,'" stated as follows:

---

[1]The State previously had subpoenaed Schuman to testify before the grand jury and at a suppression hearing. These subpoenas were withdrawn by the State after Schuman moved to quash them.

[2]Schuman was a reporter for the *Herald* at that time. He is currently a reporter for the *Morris County Daily Record.*

In an interview with *The Herald* Monday, Mayron said he had sexual relations with Susan Brennan of Lake Hiawatha late last month and then beat her in a Parsippany motel room before beating her to death and leaving her in Sparta.

Schuman's April 10 article provided further elaboration:

In a follow up phone interview with *The Herald* on Tuesday, Mayron said he killed Brennan "out of a lot of hate and a lot of anger" for her because she had sex with him so soon after they had met.

· · · · · · ·

"You just don't do that unless you love somebody", he claimed he told the girl as they drove from a Morris County motel to a wooded area of Sparta where he said he kicked and beat her while she pleaded with him.

" 'Please don't kill me. I'm sorry,' " Mayron quoted the teenager as saying.

· · · · · · ·

"I didn't mean to kill her. Just to hurt her. She was in the place of my real mother", said Mayron, who was adopted. "And that's what I felt like doing to her" (his mother).

"It was like physically it was me but mentally it wasn't. Anger and hate constantly controlled me for four or five hours."

The State served Schuman with a subpoena to testify on or about March 18, 1987. On April 1, 1987, Schuman moved before the trial court to quash the subpoena. Schuman's affidavit read, in part, as follows:

4. The testimony I am to provide on behalf of the State was obtained solely and exclusively in the course of pursuing my professional activities as a reporter for the *New Jersey Herald.*

5. I have not been an eyewitness to any alleged act or offense the Defendant is accused of having committed.

6. There is a public perception that newspersons are immune from compulsory process. The belief that newspersons cannot be called upon to testify encourages the free flow of information between sources and reporters regardless of whether the sources request confidentiality. Compelled disclosure would decrease the flow of information available to the public because reporters will be ethically compelled to advise their sources that confidentiality may not be able to be guaranteed, or reporters will refrain from disclosing their sources.

7. The information sought by the subpoena is subject to the newsperson's privilege as set forth in *N.J.S.A.* 2A:84A–21 *et seq., Evid.R.* 27, which privilege I do hereby invoke and which information I thus respectfully refuse to disclose as a witness.

At the hearing on the matter, the State explained that it sought to introduce only the specific statements made by Mayron that were reported by Schuman in the published articles.

The State represents that it "has independent evidence to prove how the telephone conversations came about and to prove that the person to whom Mr. Schuman spoke was indeed Gary Mayron." Thus, it sought neither the reporter's notes nor any other information relating to the interview. Its sole purpose was to obtain a sworn, in-court statement establishing that Mayron had uttered the words quoted in the *Herald* article. Once such a statement was obtained, it would introduce those words into evidence against Mayron under *Evid.R.* 63(7) and *Evid.R.* 63(10) as admissions and declarations against penal interest.

Schuman contends that *Evid.R.* 27(b), of the New Jersey Shield Law, *N.J.S.A.* 2A:84A–21(b), which gives a newsperson "a privilege to refuse to disclose ... any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated," guarantees that a reporter cannot be said to have waived any part of the privilege by virtue of publishing information in a newspaper. Hence, he maintains that dissemination of the information in his articles on Mayron does not constitute a waiver of his *Evid.R.* 27 privilege. The State, on the other hand, contends that because the newsperson's privilege is expressly "[s]ubject to Rule 37," governing waivers of privileges generally, that privilege is susceptible to waiver with respect to the specific information disseminated.[3] Accordingly, the State argues that since it is

---

[3]*Evid.R.* 37 reads as follows:

A person waives his right or privilege to refuse to disclose or prevent another from disclosing a specified matter if he or any other person while the holder thereof has (a) contracted with anyone not to claim the right or privilege or, (b) without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone.

A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section. The failure of a witness to claim a right or privilege with respect to one question shall not operate as a waiver with respect to any other question.

seeking Schuman's testimony regarding only information disclosed in his articles, he has waived his privilege under *Evid.R.* 37.

The trial court held in favor of Schuman and quashed the subpoena. The court cited this Court's statement in *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 187, *cert. den.,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982), that "[a]bsent any countervailing constitutional right, the newsperson's statutory privilege not to disclose confidential information is absolute." The trial court considered whether the information involved in this case, having been published, was in fact "confidential"; it concluded, "I honestly don't know." Although its "inclination" was that the information was not confidential, it decided that it would "rather err on the side of caution, in protecting the rights of the newspaper, rather than go the other way."

The State moved for leave to appeal *nunc pro tunc.* The Appellate Division reversed. 222 *N.J.Super.* 387 (1987). In its opinion, the Appellate Division conceded that "[t]he 1977 amendments to the Shield Law, literally read, provide a privilege from the disclosure of information notwithstanding dissemination of it in the media." *Id.* at 393; *see N.J.S.A.* 2A:84A–21(b); *Evid.R.* 27(b). The court nonetheless concluded that any such interpretation is contradicted by another segment of the New Jersey Shield Law, *N.J.S.A.* 2A:84A–21.3(b), which states that "[p]ublication shall constitute a waiver only as to the specific materials published". Although the latter section involves procedures whereby criminal *defendants* may subpoena newspersons, the court inferred from its terms that waiver of the privilege can still arise from dissemination even where it is the State that seeks the information. 222 *N.J.Super.* at 394. Consequently, the Appellate Division held that "the State may subpoena a newsperson and ask him about information which he has disseminated and where, as here, the source has been identified, the newsperson may be questioned about the source and the circumstances under which the information was obtained." *Ibid.*

We granted Schuman's motion for leave to appeal. 110 *N.J.* 520 (1988).[4]

## I

This appeal concerns a conflict between two competing principles: the public's right to everyone's evidence [5] and the public's right to the unencumbered free flow of information. We recognize the importance, validity, and vitality of both of these policies. Nevertheless, the New Jersey Shield Law is designed "to protect the confidential sources of the press as well as information so obtained by reporters and other media representatives to the greatest extent permitted by the Constitution[s]" of the United States and New Jersey. *In re Farber,* 78 *N.J.* 259, 270 (1978), *cert. den. sub nom., New York Times Co. v. New Jersey,* 439 *U.S.* 997, 99 *S.Ct.* 598, 58 *L.Ed.*2d 670 (1978). The continuous efforts of the New Jersey Legislature "to establish the strongest possible protection for the newsman and news media" leads us to conclude that Mr. Schuman cannot be compelled to testify against Mayron. *Id.* at 302–03 (Handler, J., dissenting). This conclusion is supported by the statutes' language, the statutory scheme, and, most importantly, by the fundamental public policies underlying the Shield Law. The statutory privilege along with these policy considerations favor protecting the press from being compelled by the State to

---

[4]We permitted the New Jersey Press Association, Inc. to participate as *amicus curiae.* Leave to file briefs as *amicus curiae* also was granted to the Newark Morning Ledger Co. and the New Jersey Herald.

[5]Jeremy Bentham recognized this policy when he pondered the following scenario: "Were the Prince of Wales, the Archbishop of Canterbury, and the High Lord Chancellor, to be passing by in the same coach, while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No, most certainly." *Branzburg v. Hayes,* 408 *U.S.* 665, 689 n. 26, 92 *S.Ct.* 2646, 2660 n. 26, 33 *L.Ed.*2d 626, 644 n. 26 (1972) (citing 4 *The Works of Jeremy Bentham* 320–21 (J. Bowring ed. 1843)). *Cf. Evid.R.* 7 (no person has a privilege to refuse to testify unless otherwise exempt by law).

testify even where the substance of the testimony sought has been disseminated in an article.

At common law, a newsperson did not have the privilege "to conceal from judicial inquiry, either the source of ... information or the information itself." *Beecroft v. Point Pleasant Printing & Publishing Co.*, 82 *N.J.Super.* 269, 272 (Law Div. 1964); *accord In re Julius Grunow*, 84 *N.J.L.* 235 (Sup.Ct. 1913). Reporters therefore turned to state legislatures for statutory protection. Presently at least twenty-six states have enacted so-called "Shield Laws," that grant newspersons privileges, of varying scope, not to disclose either the source or information. Comment, Journalists' Privilege: *In re Farber and the New Jersey Shield Law*, 32 *Rutgers L.Rev.* 545, 548–49 (1979).

The first New Jersey newsperson's privilege was enacted in 1933, and protected only the "source" of any information. *L.* 1933, *c.* 167. In 1960 the law was amended to increase the scope of the privilege to protect various sources of published information.[6] Information itself, however, was not privileged, nor were sources of information protected where the information gathered was not published. Moreover, the newsperson's privilege was subject to the full force of the waiver provisions of *Evid.R.* 37. *Supra* at 18.

As a result of court decisions, the Legislature in the late 1970s amended the Shield Law to expand substantially the media's privilege. *See Branzburg v. Hayes*, 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.*2d 626 (1972), and *In re Bridge*, 120 *N.J.Super.* 460 (App.Div.), certif. den., 62 *N.J.* 80 (1972), *cert. den.*, 410 *U.S.* 991, 93 *S.Ct.* 1500, 36 *L.Ed.*2d 189 (1973) (both of

---

[6]*Evid.R.* 27 then read as follows:

Subject to Rule 37, a person engaged on, connected with, or employed by, a newspaper has a privilege to refuse to disclose the source, author, means, agency or person from or through whom any information published in such newspaper was procured, obtained, supplied, furnished, or delivered.

which allowed a grand jury access to a reporter's materials.) [7]
In *Bridge* the court held that by disclosing the name of the
source and part of the information conveyed by the source, the
reporter had waived the privilege and could be compelled to
testify before a Grand Jury about both the source's identity and
*all* information, whether published or not, that the source had
conveyed. *Id.* at 466. The reporter, Peter Bridge, was held in
contempt and confined to jail until he purged himself by answer-
ing the questions. The incarceration of Bridge was one of the
major reasons for the passage of the 1977 amendments to the
Shield Law. *Maeeressa v. New Jersey Monthly, supra,* 89 *N.J.*
at 185; *In re Vrazo Subpoena,* 176 *N.J.Super.* 455, 462 (Law
Div.1980); Comment, *Journalist's Privilege: In re Farber and
the New Jersey Shield Law,* 32 Rutgers L.Rev. 545, 557 (1979).

The 1977 amendments increased the scope of the "source
privilege" to encompass all sources of information, regardless
of whether the information was disseminated, and also created
an "information privilege" covering all information gathered in
the scope of professional activities, whether or not that infor-
mation was disseminated. *Evid.R.* 27(a) and (b).[8]

---

[7]In *Branzburg,* the Supreme Court held that a partial disclosure of any part
of the privileged material constitutes a waiver of a newsperson's privilege
under the first amendment. The *Branzburg* majority explicitly invited states to
afford newspersons additional protections from subpoenas. 408 *U.S.* 665, 706,
92 *S.Ct.* 2646, 2669, 33 *L.Ed.*2d 626, 654 (1972). Hence, we are not bound by
*Branzburg. See* Monk, *Evidentiary Privilege for Journalists' Sources: Theory
and Statutory Protection,* 51 *Mo.L.Rev.* 1, 36 (1986). Further, our holding in
this case rests on statutory rather than constitutional grounds.

[8]*L.* 1977, *c.* 253, § 1, amended the prior *Rule* 27, *supra* note 3, in the
following manner:

Subject to Rule 37, a person *engaged in,* connected with, or employed by a
~~newspaper~~ *news media for the purpose of gathering, procuring, transmit-
ting, compiling, editing or disseminating news for the general public or on
whose behalf news is so gathered, procured, transmitted, compiled, edited or
disseminated* has a privilege to refuse to disclose, *in any legal or quasi-legal
proceeding or before any investigative body including, but not limited to,*

In 1979 the Legislature again amended the New Jersey Shield Law, *L*.1979, *c.* 479, in response to this Court's decision in *In re Farber, supra,* 78 *N.J.* 259. In *Farber* we held that a criminal defendant must be allowed to obtain exculpatory evidence through compulsory process even at the expense of the protections normally afforded the press. *Id.* at 274. *Farber* also established procedures whereby *only* the criminal defendant may overcome the newsperson's privilege. *Id.* at 276-77. The 1979 statute, *N.J.S.A.* 2A:84A-21.3 [9] reflects our holding

*any court, grand jury, petit jury, administrative agency, the Legislature or legislative committee, or elsewhere.*

*a.* The source, author, means, agency or person from or through whom any information ~~published in such newspaper~~ was procured, obtained, supplied, furnished, *gathered, transmitted, compiled, edited, disseminated,* or delivered; *and*

*b. Any news or information obtained in the course of pursuing his professional activities whether or not it is disseminated.*

*The provisions of this rule insofar as it relates to radio or television stations shall not apply unless the radio or television station maintains and keeps open for inspection, for a period of at least 1 year from the date of an actual broadcast or telecast, an exact recording, transcription, kinescopic film or certified written transcript of the actual broadcast or telecast.*

[*N.J.S.A.* 2A:84A-21.]

[9]This statute reads as follows:

a. To sustain a claim of the newsperson's privilege under Rule 27 the claimant shall make a prima facie showing that he is engaged in, connected with, or employed by a news media for the purpose of gathering, procuring, transmitting, compiling, editing or disseminating news for the general public or on whose behalf news is so gathered, procured, transmitted, compiled, edited or disseminated, and that the subpoenaed materials were obtained in the course of pursuing his professional activities.

b. To overcome a finding by the court that the claimant has made a prima facie showing under a. above, the party seeking enforcement of the subpoena shall show by clear and convincing evidence that the privilege has been waived under Rule 37 (C.2A:84A-29) or by a preponderance of the evidence that there is a reasonable probability that the subpoenaed materials are relevant, material and necessary to the defense, that they could not be secured from any less intrusive source, that the value of the material sought as it bears upon the issue of guilt or innocence outweighs the privilege against disclosure, and that the request is not overbroad, oppressive, or unreasonably burdensome which may be overcome by evidence that all or part of the information sought is irrelevant, immateri-

and procedural guidelines. *See* Note, 28 *Vill.L.Rev.* 225, 241 (1982–83).

In light of the amendments to the Shield Law, it is clear that the legislature has continuously acted to establish the strongest possible protection from compulsory testimony for the press. This is particularly true of testimony sought by the state. In *Branzburg, supra,* 408 *U.S.* 665, 92 *S.Ct.* 2646, 33 *L.Ed.*2d 626 and *Bridge, supra,* 120 *N.J.Super.* 460, the prosecution was permitted to compel the testimony of a reporter. These decisions were followed by the 1977 amendments, which expanded both the source and information privileges.

Like the amendments to the Shield Law, legislative action in related areas also displays a desire to afford the press increased protection from the State. Contrary to Federal law, the New Jersey Wiretap Act requires the State to show "special need" before it can obtain a legal wiretap of a newsperson's phone. *N.J.S.A.* 2A:156A–11. The New Jersey Legislature also has recently enacted a law strictly narrowing the circumstances in which the State may search and seize materials acquired in the course of newsgathering activities. *N.J.S.A.* 2A:84A–21.9 to –21.12. Thus, just as the Legislature's amendments to the Shield Law reflect a desire to block the State from compelling newspersons to testify, so too the Legislature's treatment of newspersons in other contexts reflects an intent to unencumber the newsgathering process. *See* Biunno, *Current N.J. Rules of Evidence, Comment 1 to Evid.R. 27.*

---

al, unnecessary to the defense, or that it can be secured from another source. Publication shall constitute a waiver only as to the specific materials published.

c. The determinations to be made by the court pursuant to this section shall be made only after a hearing in which the party claiming the privilege and the party seeking enforcement of the subpoena shall have a full opportunity to present evidence and argument with respect to each of the materials or items sought to be subpoenaed.

## II

Basic principles of statutory construction likewise dictate that Schuman not be compelled to testify. First, it is axiomatic that in construing a statute one first considers its plain language. *Kimmelman v. Henkels & McCoy, Inc.*, 108 *N.J.* 123, 128 (1987); *Renz v. Penn Cent. Corp.*, 87 *N.J.* 437, 440 (1981); *Sheeran v. Nationwide Mut. Ins. Co., Inc.*, 80 *N.J.* 548, 556 (1979). Read literally, *Evid.R.* 27(b) and *Evid.R.* 37 are easily harmonized and not in conflict. *See Loboda v. Clark Township*, 40 *N.J.* 424, 435 (1963) (quoting *Henninger v. Board of Chosen Freeholders*, 3 *N.J.* 68, 71 (1949) ("[w]herever possible statutes dealing with the same general subject will be recognized and harmonized")).

*Evid.R.* 27(b) gives a newsperson the privilege "to refuse to disclose ... any news or information obtained *in the course of pursuing his professional activities whether or not it is disseminated.*" (emphasis supplied.) As conceded by the Appellate Division, this portion of *Evid.R.* 27, read literally, provides a privilege from disclosure of information notwithstanding its dissemination in the media. The relevant portion of *Evid.R.* 37 provides that a disclosure that "is itself privileged ... shall not constitute a waiver under this section." Thus, *Evid.R.* 27(b) creates a privilege for information acquired in the course of professional activities whether or not it is disseminated, and *Evid.R.* 37 provides that a disclosure that is privileged shall not be deemed waived. Accordingly, there is no waiver under *Evid.R.* 37 and no conflict between the statutes. *In re Vrazo, supra,* 176 *N.J.Super.* at 461.

Moreover, it is well established that a subsequent specific enactment that conflicts with an earlier general one will supersede the earlier enactment. *In re Vrazo, supra,* 176 *N.J.Super.* at 461 (Law Div.1980); *accord W. Kingsley v. Wes Outdoor Advertising Co.*, 55 *N.J.* 336, 339 (1970); *Brewer v. Porch*, 53 *N.J.* 167, 173 (1969); *Cafe Gallery, Inc. v. State*, 189 *N.J.Super.* 468, 473 (Law Div.1983). Since the phrase "whether

or not it is disseminated" in *Evid.R.* 27(b) was enacted in 1977, it controls over the general waiver principles enunciated in *Evid.R.* 37 in 1960.

█ Additionally, any statutory construction that "will render any part of a statute inoperative, superfluous or meaningless, is to be avoided." *Abbotts Dairies v. Armstrong,* 14 *N.J.* 319, 328 (1954); *accord Paper Mill Playhouse v. Millburn Township,* 95 *N.J.* 503, 521 (1984). This canon will be transgressed if the "whether or not it is disseminated" language in *Evid.R.* 27 is subordinated to the general provisions of *Evid.R.* 37. Conversely, our interpretation does not render meaningless the segment of *Evid.R.* 27 that provides that a newsperson's privilege is subject to *Evid.R.* 37. Instead, we are of the view that pursuant to the latter a newsperson could waive the privilege by, for example, communicating information or sources with friends and neighbors outside the course of newsgathering activities. However, as far as dissemination in the course of professional activity is concerned, the "whether or not it is disseminated" language of *Evid.R.* 27 overrides *Evid.R.* 37.

The legislative history of the New Jersey Shield Law also supports the interpretation that the general waiver provisions of *Evid.R.* 37 do not subsume *Evid.R.* 27(b)'s "whether or not it is disseminated" language. During public hearings held prior to the passage of *N.J.S.A.* 2A:84A–21.3, the 1979 amendments, it was argued to the legislative committee that the general waiver language of *Evid.R.* 37 could be construed to be in conflict with the partial dissemination rule of *Evid.R.* 27(b). Moreover, it was urged that the general waiver language of *Evid.R.* 37 "should yield to specific, recent provisions of the new shield law"—*i.e.,* *L.*1977, *c.* 253, in particular, the "whether or not it is disseminated language" in the present Rule 27(b). *Public Hearings on Newspaperman's Privilege Law,* p. 24 (1978). A member of the committee expressed great interest in this argument, and requested its proponent to submit recommendations. *Id.* at 28. He did so. *Id.* at 3–X.

Nonetheless, the 1979 amendment, *L.*1979, *c.* 479, 2A:84A–21.3, which explicitly incorporates some of the broad waiver provisions of *Evid.R.* 37 and *does not* include the "whether or not it is disseminated" language of *Evid.R.* 27(b), applies only to subpoenas served by criminal defendants. *Assembly Judiciary, Law and Public Safety and Defense Committee Statement, A. 3062, L.* 1979, *c.* 479. The legislature was very much aware of the conclusion that would be reached through application of standard rules of construction, yet it circumscribed the scope of the statutory privilege only for criminal defendants. Thus, the language in the 1979 amendment that "[p]ublication shall constitute a waiver only as to the specific materials published" applies only to materials sought for criminal defendants.

We do not agree, therefore, with the State's contention that the 1979 amendments to the Shield Law indicate that the legislature recognized that dissemination of information through publication in the media had always constituted a waiver of the privilege with respect to the information published. The legislative history of the 1979 amendment makes it very evident that the amendment applies *only* to requests by criminal defendants. "The provisions of the bill are only applicable when a criminal defense is involved at the trial level. These procedures *could not, for example, be used by the prosecution in a criminal trial, or at a grand jury proceeding.*" (emphasis supplied.) *Assembly Statement to A. 3062, supra.* The Legislature, therefore, intended *Evid.R.* 27(b) to prevail over *Evid.R.* 37 in cases involving subpoenas served by the State. Any other reasoning flies in the face of the legislative history and principles of statutory construction just discussed.[10]

---

[10]In *Maressa v. New Jersey Monthly, supra,* 89 *N.J.* at 194–95 we reversed a trial court's order that a newspaper's partial disclosures in a libel action constituted a blanket waiver of the privilege. In *Maressa* we reasoned that if the privilege is protected from disclosure when a defendant subpoenas under

## III

■ The fundamental public policies underlying the Shield Law also favor protecting Schuman from being compelled by the State to testify. We have held that the needs of the party seeking to compel testimony of a newsperson must be "manifestly compelling." *See In re Farber, supra,* 78 *N.J.* at 267. The party seeking disclosure must demonstrate, "by a preponderance of the evidence, the non-availability of less intrusive sources which provide information substantially similar to that [which is sought]." *State v. Boiardo,* 82 *N.J.* 446, 449 (1980) (*Boiardo I*). Both *Farber* and *Boiardo* involved requests *by criminal defendants,* who, unlike prosecutors, are favored by constitutional and statutory provisions. *Boiardo, supra,* 82 *N.J.* at 458–59; *In re Farber, supra,* 78 *N.J.* at 273–74; *accord* Monk, *Evidentiary Privilege, supra,* 51 *Mo.L.Rev.* 1, 43 (1986); Note, *The Right of the Press to Gather Information,* 71 *Colum.L.Rev.* 838, 863 (1971).

In *State v. Boiardo,* 83 *N.J.* 350, 358 (1980) (*Boiardo II*), we denied a defendant's request for documents held by a reporter because other sources provided the same information contained in the requested documents. Similarly, the contents of Mayron's confession to Schuman appearing in the published articles may be attained through several other less intrusive sources: a sworn statement of Mayron, oral statements to a corrections officer, an oral confession to a detective, a series of letters written by Mayron to a former lover, and tape recordings of phone conversations with his former lover. Schuman, then, should certainly not be compelled by the prosecution to testify

---

*N.J.S.A.* 2A:84A–21.3(b), the 1979 amendment, the privilege *a fortiori* must be protected "in civil matters where the public interests in disclosure is less compelling." *Id.* at 195. The Appellate Division quoting from the 1979 amendment which states that "publication shall constitute a waiver only as to the specific materials published," erroneously concludes that *Maressa* stands for the proposition that Schuman waived his privilege with respect to the contents of his articles through publication. If it did, it would render meaningless the phrase "whether or not it is disseminated" in *Evid.R.* 27(b).

about information that is available through less intrusive means.

Other fundamental public policies underlying New Jersey's strong Shield Law support the conclusion that Schuman should not be compelled to testify. The public perception conveyed by compelling Schuman to testify will hinder the free flow of information from newspapers to the public. If a reporter is seen to be an "arm of the prosecution," the reporter will have difficulty gathering information from fearful sources. *See* Blasi, *The Newsman's Privilege: An Empirical Study,* 70 *Mich.L.Rev.* 229, 262–64 (1971); Comment, *The Newsman's Privilege: Government Investigations, Criminal Prosecutions and Private Litigation,* 58 *Calif.L.Rev.* 1198, 1204–07 (1970). Thus, the newsperson will be reluctant to disclose certain sources and information out of fear of waiving the privilege. By the same token, apprehension about subpoenas may cause the reporter to destroy valuable notes and files. See *Newsman's Privilege, supra,* 58 *Calif.L.Rev.* at 1208. The end result of such impediments may be a decrease in the effectiveness of criminal investigators. Crime stories often provide direct benefits to law enforcement agencies. *Evidentiary Privilege, supra,* 51 *Mo.L.Rev.* at 12–13. *But see Branzburg v. Hayes, supra,* 408 *U.S.* at 695, 92 *S.Ct.* at 2663, 33 *L.Ed.*2d at 647–48. For example, Schuman's articles about Mayron sketched a trail of the defendant's activities for the police to follow.

Furthermore, the paper for which Schuman worked at the time of publication of his articles on Mayron, the *Herald,* is a small daily with a full-time staff of only nine reporters. Compelling the testimony of one of its reporters or embroiling the paper in a costly, protracted controversy over a prosecution subpoena could severely hinder its newsgathering activities. It has been argued that such burdens constitute an infringement on first amendment rights. *See* Note, *The Newsman's Privilege After Branzburg: The Case For A Federal Shield Law* 29 *UCLA L.Rev.* 160, 175 n. 87 (1976) (citing *Columbia Broadcast-*

*ing Sys. v. Democratic Nat'l Comm.*, 412 *U.S.* 94, 168–69 n. 18, . 93 *S.Ct.* 2080, 2119 n. 18, 36 *L.Ed.*2d 772, 821 n. 18 (1972) (Douglas, J. concurring)).

We recognize that it is difficult to demonstrate conclusively that all of the above impediments to the newsgathering process will flow from compelling Schuman's testimony. However, the same is true of other situations in which courts have afforded protection based on a privilege—for instance, the attorney-client and marital privileges. *See Evidentiary Privilege, supra*, 51 *Mo.L.Rev.* at 5. In those contexts "we postulate harm to those relationships based not upon evidence, but merely our thoughts about human behavior, [and] it seems equally fair to postulate harm to a journalist's relationship with sources in the absence of a privilege." *Ibid.* (Footnotes omitted).

The State argues that the negative repercussions of compelling a newsperson to testify are less where, as here, testimony regarding a confidential source or undisclosed information is not at issue. A similar argument was made by the dissent in *Boiardo II, supra*, 83 *N.J.* at 365 (Schreiber, J. dissenting).

We do not, however, find the distinction between disclosed and undisclosed sources or information dispositive.[11] In *Boiardo II* we stated that purposes of the Shield Law are as important when the information is known because,

> *every* compelled production chills confidential sources. One of the purposes of the new shield law is to minimize that adverse effect by confining compelled production to cases where it is *necessary*. It is precisely where the information *is* otherwise known that the production of confidential documents should *not* be compelled, for the obvious reason that it is *not* necessary.
> [*Id.* at 360].

Similarly, in a federal case strikingly analogous to the instant case it was held that "[a]lthough no confidential source or information is involved ... this is irrelevant to the chilling

---

[11]The lack of confidentiality of the testimony sought may be a factor to be considered and balanced. *See Miller v. Mecklenburg County*, 602 *F.Supp.* 675, 678 (W.D.N.C.1985). However, the free flow of information from press to public is still encumbered when a reporter is compelled to testify about published information and sources.

effect enforcement of the subpoena would have on the flow of information to the press and public." *United States v. Blanton*, 534 *F.Supp.* 295, 297 (S.D.Fla.1982). *Contra United States v. LaRouche*, 841 *F.*2d 1176, 1181 (1st Cir.1988) (no reasoning to support such a conclusion); *Commonwealth v. Corsetti*, 387 *Mass.* 1, 5, 438 *N.E.*2d 805, 809, *stay denied*, 458 *U.S.* 1306, 103 *S.Ct.* 3, 73 *L.Ed.*2d 1391 (1982) (no common law or constitutional privilege where source and contents of statements disclosed in article). The perception created through the use of a newsperson as a prosecution witness causes some reporters and their sources to become apprehensive, regardless of whether the information sought is confidential. Moreover, it is equally burdensome for a newspaper to respond to or contest a subpoena when the testimony sought relates to non-confidential information.

An additional policy consideration that supports Schuman's position is that his testimony is sought in a trial, not a grand jury proceeding. The probability that a newsperson will be compelled to testify is greatest in the grand jury situation. *See* S. Stone & R. Liebman, *Testimonial Privileges,* § 8.13 (1983). This is true because of the Supreme Court's holding in *Branzburg* [12] that the first amendment does not protect a journalist from being compelled to provide information to a grand jury. *Ibid.* In so holding the *Branzburg* court considered the secrecy of the grand jury process as well as its crucial role in determining whether a crime has been committed and protecting citizens from unfounded accusations. *Branzburg, supra,* 408 *U.S.* at 686, 699, 92 *S.Ct.* at 2559, 2665, 33 *L.Ed.*2d at 643, 650; *accord CBS Inc. v. Campbell, supra,* 645 *S.W.*2d 30, 32. The possibility that the defendant's cross-examination of the reporter will lead to further, more problematic disclosures does

---

[12]As stated in n. 8, *supra, Branzburg* does invite states to develop additional protections from subpoenas for newspersons. Nevertheless, state courts deciding newsperson privilege issues have looked to *Branzburg* for guidance. *See, e.g., CBS Inc. v. Campbell,* 645 *S.W.*2d 30, 32 (Mo.Ct.App.1982).

not arise in the grand jury context. The same, however, is not true of the public trial. Thus, most recent cases have assumed that *Branzburg* is inapplicable outside of the grand jury situation. *See Blanton, supra,* 534 *F.Supp.* 295; *Testimonial Privileges, supra,* § 8.05 n. 62 and cases cited therein.

Further, there is very little that can be done to inhibit expansive cross-examination of a newsperson where, as here, the State is seeking to use the newsperson's testimony against a criminal defendant. Although the State intends to question Schuman only about whether he received a call from someone who identified himself as Mayron, it is impossible to conclude that defense counsel will not probe and cross examine the reporter on the circumstances surrounding the call. Likewise, it is difficult to conceive that a trial court would not permit a defendant to elicit such information. Indeed, a court's failure to do so would violate the defendant's constitutional right to confront hostile witnesses.

## IV

In sum, the legislative history and fundamental purposes of the Shield Law along with its plain language and the statutory scheme all compel a finding that Schuman did not waive his *Evid.R.* 27(b) privilege with respect to the information contained in his articles by publication of these articles. Accordingly, Schuman cannot be compelled to testify. Our holding rests solely on our interpretation of *Evid.R.* 27(b). We need not and do not address or decide any constitutional issues.

Accordingly, the judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—None.